Ross Herron, appellant, v. Ruby Herron, appellee.

No. 51995.

(Reported in 141 N.W.2d 562)

April 5, 1966.

Boyd, Walker & Concannon, of Keokuk, for appellant.

Smiths' & Dickey, of Keokuk, for appellee.

Mason, J.—This is a dispute between the mother and father of three minor children as to their custody. Plaintiff Ross Herron and defendant Ruby Herron each applied for modification of the custody provisions of the decree granting plaintiff a divorce. Following hearing by the same judge who granted the divorce on default, the decree was modified in favor of defendant and plaintiff has appealed.

We think custody of the children should have been left with the father and the decree should not have been modified. Nothing in the application or evidence gives substantial support to a claim of changed circumstances since the divorce decree was entered sufficient to warrant the change of custody, nor is a desire therefor indicated.

I. In matters involving child custody provisions of a divorce decree, the best interest of the child is the first and governing consideration. Authorities need not be cited for this. Rule 344(f)15, Rules of Civil Procedure. We have held time and again child custody and support provisions of a divorce decree are final as to the circumstances then existing. Such provisions will be modified only where it is proven by a preponderance of the evidence that subsequent conditions have so changed that the welfare of the children requires, or at least makes ex-

pedient, such modification. The burden of proof rests upon the applicant. The welfare of the child is superior to the claim of either parent and the wishes of the parents are entitled to little if any consideration. Welch v. Welch, 256 Iowa 1020, 1024, 129 N.W.2d 642, 644, and citations; Huston v. Huston, 255 Iowa 543, 555, 122 N.W.2d 892, 900; Jensen v. Jensen, 237 Iowa 1323, 25 N.W.2d 316.

On November 26, 1963, plaintiff-husband was granted a divorce evidently on the familiar ground commonly called cruel and inhuman treatment. The parties stipulated and the court decreed that custody of the three minor children be awarded plaintiff subject to reasonable visitation rights of defendant-wife, including her right to have the children in her home each year during spring school vacation, Christmas day from 1 p.m. until the day before school commences in January, and from June 15 to August 20. Plaintiff was to pay $10 a week per child toward their support while they were visiting defendant.

August 6, 1964, plaintiff, who had remarried with court permission, filed application to modify the decree to permit him to have reasonable visitation rights with the children during the time they were visiting with defendant and for definite times therefor.

At the hearing on this application plaintiff testified defendant had had no communication with him or the children from the time of the divorce until she came back in May 1964. Each accused the other of making excuses as to why the other could not have the children at various times. Plaintiff asserted he had experienced difficulty getting the mother to permit the boys to be enrolled in the youth summer camp and he would like to have the children on Sundays during the summer so they might be taken to church. Defendant explained her failure to exercise her visitation rights from the time of the divorce until May 1964 by saying she was taken ill while visiting her sister in New York. At the conclusion of the hearing the court denied any modification.

April 8, 1965, plaintiff filed another application for modification of the decree, contending defendant did not have a proper home or facilities to care for the children during the periods

specified in the decree and the children became nervous and upset while in defendant's custody, requiring medical attention upon their return to plaintiff.

Defendant moved to dismiss plaintiff's application, asserting he alleged no changed circumstances from the time of the original decree and that identical issues were raised and ruled upon by the court in its previous order.

On April 26, the day of trial, defendant filed application for modification of decree asking that the permanent care, custody and control of the minor children be transferred to her subject to reasonable visitation rights of plaintiff, requiring him to pay child support, alleging violation of the terms of the stipulation on plaintiff's part insofar as defendant's visitation rights were concerned, alleging the children were unhappy with plaintiff, suffer from want of care by their mother, the best interests of the children required a change in custody and alleging these were changed circumstances from the time of the original decree.

II. Before proceeding to hear evidence in the matter, the court overruled defendant's motion to dismiss plaintiff's application. Plaintiff called as a witness Dr. Benjamin D. Van Werden of Keokuk who had treated all the Herron children for various minor ailments. He treated Mark, the oldest, for an ulcer on December 26, 1964. Doctor Van Werden testified his profession did not know just what caused ulcers in young children, but felt tension had much to do with it. In his opinion Mark's symptoms came from the broken home, his anxiety had been noticeable since Christmas but was not noticeable before the divorce. The doctor had not seen the two younger children for some time.

The doctor's records indicated defendant had been admitted to the hospital in Keokuk October 23, 1963, giving a history of family trouble, she had left her husband on two or three occasions. On this evening she decided to leave and went to a hotel. After she became frightened, she called her husband to get her. Plaintiff, accompanied by a minister, took her to the hospital but the next morning she left before being examined.

Ruby Herron detailed her contention of difficulty in seeing the children while in plaintiff's custody. She asserted she was

not able to take the children to church on Easter because Mark did not have proper clothing, and although she had made reservations to take them out for dinner, Mark asked not to be taken because he was embarrassed to wear his slacks, which defendant described as dirty with spots and many holes.

At the conclusion of this testimony the court inquired of counsel if defendant asked for the children's custody and when advised that she had, the court indicated testimony should be offered concerning defendant's home.

Defendant testified she lived in a three-room house in Keokuk, consisting of a combination living room, bedroom and kitchen. When the children stayed with her at Easter, she had two beds in the bedroom and the little girl slept with her. She was employed as a factory worker in Keokuk at approximately $65 per week and paid $25 per month rent. During Easter vacation Mark occasionally slept on the floor and sometimes all three children slept with her. There was no shower or bathtub and the children were bathed in a galvanized tub. Over Christmas she had a three-room apartment but had only the two children. The previous summer she had an apartment with two rooms, also a bath shared with two other apartments. Her present living room was "at least 12 by 12, the kitchen nearly as big". When later recalled as a witness, defendant, 31 at the time, testified she was going to marry Robert Heiser, age 50, very soon although the date had not been set.

The foregoing is the entire record as to the facilities defendant could furnish for the children if the court awarded their custody to her. The record is barren as to defendant's intention to arrange for church attendance, location of the school the children could attend, the background of Robert Heiser, the intended husband, and care of the children while defendant was away at work.

Plaintiff, on the other hand, testified in rebuttal he and his present wife lived in a three-unit apartment house, renting two apartments and occupying one, consisting of a very large living room, dining room, kitchen and bedroom for the children approximately 15 by 30. Plaintiff and his wife had their own bedroom with bath and basement facilities. He intended to partition

the children's bedroom. Much of the rest of the record consists of the dispute between the parties as to the exchange of the children for visitation rights.

At conclusion of testimony the court by stipulation visited with Mark, then about ten, in chambers with only the court reporter and principals present, making a record of the proceedings.

The court asked Mark to tell him how he felt in order to help him make a decision. The boy testified he loved his mother and father but he believed he would be happier with his mother because sometimes his dad got real "pretty mean". He felt his younger sister was mixed up, when she was with the father she cherished him and when she was with the mother she cherished her, and while Nickie loved both his parents, Mark felt his brother would be happier "with Ruby".

One of the matters brought out by the court's conference with this ten-year-old boy was that Candy, his four-year-old sister, ate slowly and when she was with Ruby, "Ruby gives her enough time to finish so she won't get sick, but when we are with mother and dad, they hurry her too much and if she doesn't get done, she gets spanked. * * * They try to hurry her so much." When asked to explain what he meant by "they hurry her too much," Mark testified when they were working, like moving a big pile of rocks, they were hurried quite a bit by the mother and dad. On one occasion Mark sat down too hard in a chair, tipped over and knocked over a lamp, and his dad got real mad about it and beat him with a belt. He carried marks for two months, several times he could hardly walk it hurt so much. When asked how many times his father spanked him, Mark said, "Quite often. Enough." When pressed for how often, he testified "Four or five times a month with a belt, always with a belt." Mark heard his father talk over the telephone with Ruby on different occasions about visiting the children. On one occasion the father told Ruby they were going to be busy that .day and "we just stayed home and he slept."

At conclusion of the conference the court expressed his appreciation to Mark for helping him. Mark replied, "Any help I

can be, I'm happy." The trial court noted they were three nice children and "Ruby ought to be very proud of you."

Ross Herron was recalled and testified concerning the spanking he had given Mark with the belt. Mark had been kept from the Y. M. C. A. because of ulcers, but was finally given doctor's approval to go back providing he would take it easy. He could go to the lobby but had been warned not to go swimming. Later plaintiff was notified the boy had been caught stealing at the Y. M. C. A. and when confronted, the boy lied by telling plaintiff he did not do it but finally admitted it. Plaintiff admitted spanking the boy on other occasions.

In its decree ordering the three children transferred from plaintiff to defendant the court found Mark's illness caused by the child's tension was a change of circumstances sufficient to support the change of custody, the best interests of the children were of primary concern, "there is a presumption that the best interests of the children of tender years is with the mother", and the custody established by the stipulation was not in the best interests of the children.

III. In addition to what has been said, there are other reasons why the trial court's decree cannot stand. As stated, the original decree entered in November 1963 granted the father sole custody of Mark, then nine, Nicholas, then seven, and Candace, then three, subject to defendant's reasonable visitation rights. That decree necessarily determined plaintiff's fitness to have the children at that time. It was final as to the circumstances then existing. Welch v. Welch, supra, 256 Iowa, at 1024, 129 N.W.2d, at 644; Smith v. Smith, 257 Iowa 584, 589, 133 N.W.2d 677, 680; Huston v. Huston, supra, 255 Iowa, at 554, 122 N.W.2d, at 899. Such provision can be modified only under the circumstances stated in Division I, supra.

The trial court misapplied the presumption referred to in its findings. In a hearing for a change of custody from the father, who has previously been awarded custody, to the mother, we do not indulge in any presumption or inference that a child would be better off in the custody of the mother. Dow v. Dow, 240 Iowa 145, 152, 35 N.W.2d 853, 857; Maron v. Maron, 238

Iowa 587, 591, 592, 28 N.W.2d 17, 19; Huston v. Huston, supra, 255 Iowa, at 554, 555, 122 N.W.2d, at 899.

The court further found defendant was then residing in a three-room house in Keokuk which it felt was inadequate for the mother and three children. "However, defendant testified she was planning to be remarried within a short time. The court therefore assumes defendant will be occupying enlarged premises which will be suitable for the care of the three children."

It seems to us that in considering the best interests and welfare of the children, the court was speculating too much on what defendant might do in the future. While it is true the trial court observed the witnesses and was impressed during the trial by defendant's conduct and testimony, thought she appeared honest, soft-spoken and kindly, while plaintiff appeared to be vindictive, harsh and egotistical, it is our responsibility to consider the case de novo.

IV. We feel the court's conference with Mark was given undue weight by the trial court. The wishes of a seven- or eight-year-old or even a ten-year-old child should be given little if any weight since they are not of an age to exercise discretion in choosing a custodian. While Mark's wishes are perhaps entitled to more consideration than Nickie's in an application for change of custody based on alleged subsequent change of circumstances, they are of less weight than if this were an original hearing on custody. Smith v. Smith, supra, 257 Iowa, at 591, 133 N.W.2d, at 681; Dow v. Dow, supra.

V. The day of the order changing custody defendant filed application for citation for contempt against plaintiff for failure to turn over the children. Plaintiff was ordered to appear and show cause on April 30.

Plaintiff had filed a combined motion for new trial and stay. April 30 he amended his motion for new trial supported by affidavits of residents of Keokuk, including neighbors, members of his church, defendant's sister-in-law and brother, a neighbor of defendant, plaintiff's attorney, Nickie's and Mark's teachers, plaintiff's employer and the Boys' Y. M. C. A. director.

At the hearing the court dismissed the application for contempt on condition plaintiff immediately transfer custody of the

children to defendant, overruled plaintiff's motion for stay and again observed that although he had found defendant's present home was too small and, therefore, inadequate for the mother and three children, it was for the best interests of the children that they be transferred immediately to the mother in order to reduce the tension and pressure under which the children were living, with the understanding enlarged quarters would be obtained within a reasonable time. Counsel then stipulated that additional evidence would be furnished in connection with the motion for new trial which was set for May 6.

The court heard the motion for new trial and plaintiff's application for temporary injunction filed that day, asking defendant be restrained from removing the children from the court's jurisdiction.

Plaintiff relied on the affidavits filed. Rule 245, Rules of Civil Procedure. Defendant testified she had read the affidavits concerning her relationship with Bob Heiser whom she was going to marry the following Saturday. Heiser was then employed as an interior decorator in Leavenworth, Kansas; at the hearing on April 26 it appeared he was employed by Bethlehem Steel Corporation. Defendant stated she had made arrangements to move to Leavenworth where Heiser had rented a three-bedroom modern home for her and the children. Admitting she had dated Heiser for the past year, she denied dating him prior to her divorce from plaintiff. The affidavits of her brother and sister-in-law declared defendant went to live with Heiser in Hamilton, Illinois, three times while married to plaintiff, staying nine weeks on the second occasion. Defendant admitted Heiser had visited her in her apartment but said he had never stayed overnight.

The affidavit of a neighbor of defendant asserted she had a man visitor from Friday to Monday every weekend since she moved there in January except for Easter and the week thereafter. The affiant stated she had seen him arrive and leave, helped defendant move into her present apartment and it was common knowledge among the neighbors that she had been living with a man all weekends except two since January. Defendant admitted she was in the home of Heiser but said it was only as a

friend when plaintiff's employer talked with her before the divorce and on this occasion she was still in bed. Defendant knew Mr. Heiser had had two previous marriages and had been adjudged bankrupt once before.

Another affidavit stated Mark had told affiant a man stayed overnight with defendant when the children were there. The affidavits of members of the church and minister stated plaintiff and his present wife were diligent in their church attendance and the Herron children were in church fairly regularly. Both teachers said they had no problems with the children until after Easter, although one stated she noticed Nickie's work suffered after Christmas. One teacher related Nickie repeated an off-color joke to her he said his mother told him. Another teacher lived in the same apartment house occupied by plaintiff and indicated the children were very happy and the family was exceptional.

The Y. M. C. A. director asserted plaintiff had assisted him in transporting boys to swimming meets, the plaintiff's sons had never made complaint to him about the father's cruelty, in March it had been reported to him that Mark was going through boys' pockets in the locker room and he reported the incident to plaintiff. The next day Mark came to the director and apologized to him and another gentleman who had caught him, relating no facts about his father's cruelty other than making him admit the attempted theft, and the boy showed no physical impairment therefrom.

Defendant did not comment on any of these affidavits during her testimony nor did she request the appearance of affiants for cross-examination.

A great deal more could be recited as to defendant's conduct prior to the trial court's decree, but with the burden on defendant as stated in Division I, supra, nothing would be gained thereby.

VI. The court denied the application for temporary injunction upon being assured by defendant, through her attorney, that she would produce the children at any further time required by the court or this court.

The following from 27B C. J. S., Divorce, section 313,

1062

quoted with approval in Jensen v. Jensen, supra, 237 Iowa, at 1330, 25 N.W.2d, at 320, is pertinent:

 "It is against the policy of the law to permit the removal of the child from the jurisdiction unless its welfare would be better subserved thereby, and ordinarily custody should not be awarded to a nonresident or to one contemplating immediate removal from the state." Nothing said in Smith v. Smith, supra, is inconsistent.

The motion for new trial was overruled.

 It follows that the action of the trial court in awarding custody of the minor children to defendant and requiring plaintiff to pay support as directed in its order of April 26, 1965, is reversed and the cause remanded with directions to the trial court to enter a decree restoring custody of the children to the plaintiff with defendant having the right of visitation every third Sunday of the month from 1 p.m. to 6 p.m. without removing the children from Keokuk.

VII. We may observe defendant has filed no brief. However, the printed record on which the appeal was presented was agreed to.—Reversed and remanded with directions.

All JUSTICES concur.