DARCEL, INC., Plaintiff-Respondent,

v.

# CITY OF MANITOWOC BOARD OF REVIEW, Defendant-Appellant-Petitioner.

Supreme Court

*No. 84–2470. Argued March 2, 1987.—Decided May 12, 1987.*

(Also reported in 405 N.W.2d 344.)

For the defendant-appellant-petitioner there were briefs by *Patrick L. Willis,* city attorney, Manitowoc and oral argument by *Patrick L. Willis.*

For the plaintiff-respondent there was a brief by *Joan Ravanelli Miller, Peter W. Deschler* and *Nash, Spindler, Dean & Grimstad,* Manitowoc, and oral argument by *Joan Ravanelli Miller.*

STEINMETZ, J. This is a review of a decision of the court of appeals affirming the order of the trial court.[1] The question before the court is whether the City of Manitowoc Board of Appeals (the board) erred by affirming a property tax assessment based on "market" rental income when there was a recent arms-length sale of the property from which to determine fair market value. We conclude that an arms-length sale price is the best indicator to determine fair market value for property tax purposes and an approach that considers factors extrinsic to the arms-length sale is not statutorily correct and therefore in error as a matter of law.

All the stock of Darcel, Inc. was sold on August 10, 1983, for $4,100,000. The only asset of Darcel, Inc. was the Mid-Cities Mall. On January 1, 1984, the city of Manitowoc assessed the fair market value of the mall at $5,231,000 for the 1984 tax year. This assessment was based in part on what the assessor determined to be the fair market value of the store rental property. According to the city assessor, the market value was much greater than contract value of many

---

[1] *Darcel, Inc. v. Manitowoc Review Bd.,* 128 Wis. 2d 204, 381 N.W.2d 575 (Ct. App. 1985).

of the leases because certain leases were long-term leases entered into in 1968 at the fair market value at that time.

Darcel, Inc. (the new owners) filed a written objection to the assessment pursuant to sec. 70.47(7), Stats., following which the Board of Review convened, took evidence, and sustained the assessor's estimates by a vote of four to three. Darcel then petitioned the Manitowoc county circuit court for a writ of certiorari. The writ was granted by the Honorable Fred H. Hazelwood, who remanded the case to the board for further consideration. Judge Hazelwood held that the board ignored the competent evidence of an arms-length sale, and the board's conclusion was not supported by any evidence in the record.

The board appealed the trial court's decision to the court of appeals which affirmed the trial court. The court of appeals, after determining that the board would be in error as a matter of law if it considered extrinsic factors in the presence of an arms-length sale, determined that the sale of the Mid-Cities Mall was indeed an arms-length transaction. *Darcel,* 128 Wis. 2d at 214. The board petitioned for review of that decision to this court.

This court stated the standard of review which applies for certiorari appeal from boards of review in *State ex rel. Boostrom v. Board of Review,* 42 Wis. 2d 149, 155, 166 N.W.2d 184, 187–88 (1969):

> " 'The principles of law are well settled governing the jurisdiction of courts in reviewing the findings of boards of review on *certiorari.* The duties of boards of review are *quasi*-judicial and courts have no jurisdiction to disturb their findings or determinations except where they act in bad faith or exceed their jurisdiction. Judicial review of

the action of boards of review on *certiorari* extends only to jurisdictional errors. If the board of review does not act arbitrarily or dishonestly and the evidence presented before it is sufficient to furnish any substantial basis for the valuation found by the board, its decision will not be disturbed. The review here extends only to the correction of jurisdictional errors and does not include mere errors of judgment as to the preponderance of evidence. Upon *certiorari* to a non-judicial body such as a board of review, the court will review the evidence only so far as to ascertain if there is reasonable ground for belief that the decision is the result of honest judgment, in which case it will not be disturbed. This court will review the proceedings to ascertain whether such body has kept within its jurisdiction and whether such board acted upon competent evidence sufficient to give it jurisdiction. The presumptions are all in favor of the rightful action of the board. The assessor's valuation of the property is *prima facie* correct and is binding upon the board of review in the absence of evidence showing it to be incorrect.'" (Citations omitted.) Quoting from *State ex rel. Pierce v. Jodon,* 182 Wis. 645, 647–48, 197 N.W. 189 (1924).

These standards were summarized in *State ex. rel. Mitchell Aero v. Bd. of Review,* 74 Wis. 2d 268, 281–82, 246 N.W.2d 521 (1976):

"[O]n a review such as this only the following factors may be considered: (1) Whether the board kept within its jurisdiction; (2) whether it acted according to law; (3) whether its action was arbitrary, oppressive or unreasonable and represented its will and not its judgment; and (4) whether the evidence was such that it might reasonably make the order or determination in question."

The board argues that, because the long-term leases on this property were several dollars per square foot below the "going rate" for mall rental space in similar malls, the recent sale price was not the "full value which could *ordinarily* be obtained therefor at private sale."[2] (Emphasis added.) The board contends that, although the buyer purchased all the rights the seller possessed to sell in an arms-length transaction, the leaseholder owned valuable rights that were not included in the sale price. Some long-term leases were generating only $1.09 per square foot rent while other space inside the mall and in other malls generated between $6 to $10 per square foot. Indeed, one long-term tenant renting space for $1.09 per square foot was subletting the space for $5.75 a square foot. Thus, the presence of the long-term leases artificially lowered the sale price to less than "full value." The board asserts the only way the assessor could determine "full value" was to use the income approach and use a fair market rent to determine property value.[3] While

---

[2]Section 70.32(1), Stats., states:

"**Real estate, how valued.** (1) Real property shall be valued by the assessor in the manner specified in the Wisconsin property assessment manual provided under s. 73.03(2a) from actual view or from the best information that the assessor can practicably obtain, at the full value which could ordinarily be obtained therefor at private sale. In determining the value the assessor shall consider, as to each piece, its advantage or disadvantage of location, quality of soil, quantity of standing timber, water privileges, mines, minerals, quarries, or other valuable deposits known to be available therein, and their value; but the fact that the extent and value of minerals or other valuable deposits in any parcel of land are unascertained shall not preclude the assessor from affixing to such parcel the value which could ordinarily be obtained therefor at private sale ...."

[3]The Property Assessment Manual for Wisconsin Assessors, Vol. I, at 7–19, 19–20 (Revised 12/82) describes the income approach to valuation as:

the board admits that the sales transaction was arms-length, it insists that not all of the "bundle of rights" that make up the property were transferred to the new owners because some of the value of the rights was retained by the long-term tenants. However, these were rights of the tenants, not the seller-owner.

The mall owners argue that they did buy all the "bundle of rights" that comprised the property. They purchased the land the buildings stood on, the physical plant, the right to the rental income through the leases, and the reversions when the leases expired. Since the mall owners had to bear the burden of honoring the leases that did not generate market rent, they must have purchased all the contractual rights accompanying such a lease.

It is immaterial that the lease was a detriment to the property; it was transferred to the new mall owners, and its value was reflected in the sales price of the property. Thus, the sale was an arms-length transaction and clearly the best evidence of the "full value" of the property.

Fair market value or full value of property is consistently defined as: "[T]he amount it will sell for upon arms-length negotiation in the open market, between an owner willing but not obliged to sell, and a buyer willing but not obliged to buy." *State ex rel. Mitchell Aero,* 74 Wis. 2d at 277.

The Property Assessment Manual for Wisconsin Assessors, Vol. I, page 7–3 (Revised 12/82) states the

"The income approach is the conversion of anticipated future benefits (income) into an estimate of the present worth of a property. This process is called capitalization. When there is no sale of the subject and no comparable sales are available the income approach can be used along with other information to make an assessment."

628

conditions necessary for a sale to be considered a "market value" transaction:

"1. It must have been exposed to the open market for a period of time typical of the turnover time for the type of property involved.

"2. It presumes that both buyer and seller are knowledgeable about the real estate market.

"3. It presumes buyer and seller are knowledgeable about the uses, present and potential, of the property.

"4. It requires a willing buyer and a willing seller, with neither party compelled to act.

"5. Payment for the property is in cash, or typical of normal financing and payment arrangements prevalent in the market for the type of property involved."

Although the board contested the satisfaction of these conditions in the lower courts, it concedes here that the sale of the Mid-Cities Mall was an arms-length transaction, at least as to the rights sold in that transaction. This court has previously held that it is error for an assessor to use other means to assess the value of property in the presence of an arms-length sale. *State ex rel. Geipel v. Milwaukee,* 68 Wis. 2d 726, 737, 229 N.W.2d 585 (1975). However, this assessor did have a duty to determine if the sale was at arms-length and properly investigated further. While his investigation uncovered some "red flags" that could have indicated an other-than-arms-length sale, these "red flags" were later explained to the satisfaction of the circuit court, and did not appear to be the basis of the board's findings.[4]

[4]At the board and at the lower court, the assessor challenged the arms-length character of the sale by citing numerous out-

■■■

The mere claim of an arms-length sales should not foreclose the assessor from further investigation to determine the nature of the sale. Only through investigation and comparison can an assessor determine if the sale is truly at arms-length. From the record it appears that the Manitowoc city assessor entered his comparative study of shopping malls with just such an investigation in mind. However, such an investigation should only be given credence if it produces the "best information" possible, and better information than a facially arms-length sale. Because of the nature of shopping malls[5] and like property that are unique in nature, a sale that meets the arms-length qualifications stated previously will represent the full value of the property. Any comparative information about other shopping malls would be, at best, speculative, and at worst, totally subjective.[6] Information that would suggest that the mall was not

standing bills the prior owner had, that the prior owner was being pursued by creditors for these bills, and that the property was soon to be subject to foreclosure. The circuit court found that since the five factors stated in the Assessor's Manual were met, any suspicion of an other-than-arms-length sale was overcome.

[5]*See infra* n. 7

[6]Prior to 1980, the Mid-Cities Mall's assessed value was $2,895,600. On January 1, 1980, as part of a reassessment of the whole city, the mall was reassessed by an outside assessment contractor at $5,231,900. The 1980 assessment was not challenged by the prior owners of the mall and remained the same until the 1984 assessment. The city assessor's actual comparative results were *higher* than this figure by nearly $500,000; he reduced them as "close enough" to the prior assessed value.

These facts suggest that the city assessor was not making a totally independent valuation of the property but striving to support someone else's prior high assessment.

being used to the highest and best use speculates about the ability of the owners to rent the property. While this may not be true of all property with leases, the sale price should be conclusive of market price unless there is evidence that the leases themselves were not entered into at arms-length and in good faith. Sale-leaseback situations, for instance, may be undertaken with terms to avoid property tax and might not be entered at arms-length.

Since the board initially asserts that not all the property rights were transferred, it is necessary to determine what those property rights were before the sale. First, the prior owner had fee simple of all the actual real estate, including the mall area and parking areas. It is clear that the areas in fee simple were purchased in an arms-length sale.

Second, the prior owner had leased certain areas of the property. By doing so, the right of occupation of the leasehold was contracted away for a right to a certain amount of rent. In addition, the prior owner retained the reversion of the leasehold estate. It is clear that the new owner received: 1) the same right to collect rent that the prior owner had retained as a result of entering the lease agreements, and 2) the reversion of the leasehold estate. This, too, was part of an arms-length transaction.

Third, all other encumbrances (such as easements) that might have been present on the property were transferred. These are not at issue in the present action.

From this analysis, it is clear that all of the "bundle of rights" that made up the property were transferred in this sale. The new owners received exactly those rights possessed by the former owners.

The board's complaint, however, is that the prior owners did not own the "full value" of the tenant's leasehold. By operation of the rental marketplace, like the marketplace for real estate itself, the value of the tenant's leasehold has increased independent of the contract itself. This increased value is evidenced by the difference between the rent specified by the long-term lease and "market" rental. Since the prior owners never "owned" this increased value, the prior owners could not transfer this value to the new owners, even though all the rights that made up the property were transferred. Although the rights themselves were transferred, some of the value of the rights were not transferred. Therefore, the argument is the price paid by the new owners to the prior owners did not reflect the true value of all the rights in the property.

The city assessor based his conclusion that not all the rights were being sold or that not all the value was being conveyed on his survey of eleven shopping malls over the state of Wisconsin and their sales prices in recent years. From this, the assessor derived a weighted average rental value per square foot. This, he concluded, was the "market price" of mall rental space that could be applied to the Mid-Cities Mall.

We find this analysis not acceptable. The assessor's "value" theory is entirely dependent on what comparable market rates are for rent. However, what the parties contracted for was a leasehold, not just a month-to-month tenancy, but a long-term lease with terms and conditions that made it unique when compared to other kinds of leases. When an assessor judges the value of real estate without a recent sale, he often looks at "comparable sales"—"properties that are similar to the subject property in age,

condition, use, type of construction, location, number of stories, and physical features.[7] The more similar the

[7]The Property Assessment Manual for Wisconsin Assessors in effect at the time of this assessment states:

"The valuation of shopping centers can be difficult. Because each shopping center is unique, it [is] hard to find comparable sales. Each shopping center has a different type and number of stores, the location is different. In order to use the comparable sales, the assessor will have to make allowances for these differences which will be very subjective. Thus, the assessor is left with the income and cost approaches. *In applying the income approach the assessor may have difficulty determining the appropriate market rent and correct expenses, as there are few comparables.* However the income approach may best reflect market value as *investors are mainly concerned with the income generated by the property,* and base their purchase and development decisions on this." (Emphasis added.) Wisconsin Assessment Manual for Wisconsin Assessors, Vol. I, at 9–18 (Revised 12/81).

This quote certainly supports the theory that a recent arms-length sale : preferable to any other method of valuing shopping centers. The goal of any other method is to ascertain what an investor would pay for the property, and contract rents, not market rents, are the clearest indicator of what the investor would pay.

The record reflects that the city assessor *did* have problems finding comparable sales. The Mid-Cities Mall, by the assessor's estimates, included 242,368 square feet of leasable space. The eleven malls the assessor based his calculations on were from 38,000 square feet to 184,000 square feet, but no mall was over 200,000 square feet. The malls most divergent in size, the 38,000 square foot mall and the 184,000 square foot mall, had the lowest market rents of all eleven on a square foot basis, $1.63 and $1.72 per square foot, respectively. A close study of the chart entered into evidence showed no patterns whatsoever that would allow for an "extrapolated" value on the basis of square feet as related to sales price. Averaging non-comparable property does not render the average comparable.

sold property is to the subject, the more valid is the sale price as an indicator of the value of the subject property."[8]

When an assessor is assessing the value of leaseholds, he is not justified in simply comparing the "bottom line," that is, what is the rent charged on the leases. If the assessor wishes to establish comparable leaseholds, he must examine other elements about the lease: the location of the rental property within a mall, whether the lease was for an "anchor" store or for a smaller store within the mall, the type and age of the mall that the leasehold is in, relative vacancies in the malls, and the length and terms of the lease that created the leasehold. If the assessor finds that the

However, the new mall owners testified that it is the practice of the "mall industry" to find the full market value shopping centers by multiplying the mall's net operating income by a factor of ten. The assessor's chart of the eleven shopping centers included a column of "net operating incomes." When those figures are multiplied by a factor of ten, the product is nearly always roughly equal with the sales price of the eleven malls.

The "ten-times-net-operating-income" rule, when applied to the Mid-Cities Mall, yields a full market value of $3,890,000, $210,000 less than the eventual sales price. The new mall owners testified that the lower value was their first offer, but it was necessary to raise the price to make the deal.

The Property Assessment Manual for Wisconsin Assessors, Vol. I, at 7–16 (Revised 12/82) uses a similar method of valuation called the "Gross Rent Multiplier." Instead of using the net income, this approach uses the gross rental income to derive a "factor" from comparable properties in relation to the comparable sale price. This factor is multipled by the gross operating income of the property to be assessed to determine an estimate of value.

[8]Wisconsin Assessment Manual for Wisconsin Assessors, Vol. I, at 7–12 (Revised 12/82).

rental rate per square foot is not substantially lower than other leases that were contracted in the same historical period, his inquiry is at an end. If the lease price per square foot is historically justified, the sale price of the real estate is the best information about full value of the property for tax purposes.

■

However, there is no evidence whatsoever that the long-term leases in the Mid-Cities Mall were not entered into at arms-length or were below market value for long-term leases of that type. The city attorney, appearing for the board, admitted at oral argument that there was no evidence that the long-term leases were not entered into at arms-length or were below market value at the time of their inception. The leases in the Mid-Cities Mall that are allegedly below market leases were entered into in 1968 for a period of fifteen years with options. If the leases were entered into at arms-length when drafted, sale of the leases represented the full value of the leasehold. Since both the full value of the leasehold interests and the prior owner's interests were sold to the new owners of the Mid-Cities Mall, all the interests in the property were transferred. The price for these interests was the price paid at the arms-length sale, $4,100,000. That price represents the best information about the full market value of the property because it is the full market value of the property.[9]

[9]The new owners willingly admit an additional $30,000 of improvements to the property since the date of the sale and do not contest inclusion of the new improvements in the eventual assessment. Improvements that have taken place after the recent arms-length sale of the property would have to be assessed and the value of those improvements added to the arms-length sale price.

If an encumbrance on the subject land would equally subject all potential buyers to the same decreased use or rent of the property, and the encumbrance was entered into at arms-length for a fair market price at the time it was entered, it should be considered to lower the full market price of the property. This means that any current market value of the encumbrance should not be allowed to distinguish an otherwise arms-length sale of the property itself, and the presence of such an encumbrance should be considered when assessing the full market value of the encumbered land.

We are not convinced by the precedent that the board cites from other jurisdictions that this approach is incorrect.[10] In most of the cases cited, the courts did

[10]*Caldwell v. Department of Revenue,* 122 Ariz. 519, 596 P.2d 45 (1979); *Clayton v. County of Los Angeles,* 26 Cal. App. 390, 102 Cal. Rptr. 687 (1972); *Martin v. Liberty County Bd. of Tax Assessors,* 152 Ga. App. 346, 262 S.E.2d 609 (1979); *Springfield Marine Bank v. Property Tax Appeal Bd.,* 44 Ill. 2d 428, 256 N.E.2d 334 (1970); *Oberstein v. Adair County Bd. of Review,* 318 N.W.2d 817 (Ia. App. 1982); *Donovan v. City of Haverhill,* 247 Mass. 69, 141 N.W.2d 564 (1923); *Crossroads Center, Inc. v. Commission of Taxation,* 286 Minn. 440, 176 N.W.2d 530 (1970); *DeMoulas v. Town of Salem,* 116 N.H. 775, 367 A.2d 588 (1976); *Parkview Village Association v. Collingswood,* 62 N.J. 21, 297 A.2d 842 (1972); *People ex rel. Gale v. Tax Commission,* 17 A.D.2d 225, 233 N.Y.S.2d 501 (1962); *In Re Property of Pine Raleigh Corp.,* 258 N.C. 398, 128 S.E.2d 855 (1963); *Wynwood Apartments v. Board of Review of Cuyahoga County,* 59 Ohio St. 2d 34, 391 N.E.2d 346 (1979); *Swan Lake Moulding Company v. Department of Revenue,* 257 Or. 622, 480 P.2d 713 (1971); *Kargman v. Jacobs,* 113 R.I. 696, 325 A.2d 543 (1974); *Yadco, Inc. v. Yankton County,* 237 N.W.2d 665 (S. Dak. 1975); *Rowland v. City of Tyler,* 5 S.W.2d 756 (Tex. Com App. 1928); *Board of Supervisors of Fairfax County v. Nassif,* 290 S.E.2d 822 (Va. 1982).

not have the advantage of considering an otherwise arms-length sale when considering the assessment. In these cases, the taxpayer, by introducing evidence of lower-than-market rents, attempted to distinguish the estimate of true market value, based on market rents rather than contract rents. In other words, the taxpayer attempted to supplant one estimate with another estimate. In the current case, the assessor attempted to supplant the actual arms-length sale price with an estimate based on non-comparable property. While the principles involved may be the same, the injustice of taxing the current market value of the leasehold is most clearly demonstrated when a sale has occurred.

In two cases cited a recent sale had occurred. In *Pepsi-Cola Bottling Co. v. Bd. of Assessors,* 397 Mass. 447, 491 N.E.2d 1071 (1986) Pepsi had built the original building in 1957 and sold it under a "leaseback" arrangement. Under the terms of this leaseback, Pepsi was to pay the "owner" of the property $1.44 per square foot during the duration of the longterm lease period, but Pepsi retained the option to renew the lease at 63¢ per square foot. Additionally, Pepsi was to pay all property taxes and assessments, all fire and liability insurance premiums, all utility charges, ordinary and structural repairs and maintenance. Pepsi leased and occupied the entire property and improvements.

The regular term of the lease expired in December, 1982, and Pepsi exercised its option and began

We note that *C. A. F. Inv. Co. v. Tp. of Saginaw,* 410 Mich. 428, 302 N.W.2d 164 (1981) supports the use of actual rental income and rejects any reference to potential income when estimating the fair market value of the property. The Michigan court concluded that such a rule was valid even in the absence of a recent armslength sale of the property.

paying 63¢ per square foot rent. In February, 1983, the property was sold in an otherwise arms-length transaction for $310,000. The assessment board found comparable properties under lease for $2.80 to $3 and applied the $2.80 rate to the Pepsi property.

While the *Pepsi* court approved using market rates because the tenant's rights were not "valued" in the sale, the *Pepsi* sale can be distinguished from the sale of the Mid-Cities Mall and the leases therein. In *Pepsi,* whether the original lease was at arms-length is questionable because of the sale-leaseback agreement. Clearly, even if the market rate of leases were $1.44 per square foot, no reasonable arms-length lease agreement would provide for an additional cut in rent after more than two decades. In addition, since Pepsi was responsible for the property taxes instead of the owner, it was in Pepsi's best interest to drive the value of the property as low as possible. Moreover, Pepsi as lessee had so many of the duties of an owner it was almost indistinguishable from an owner. Under the terms of the lease, the only thing the eventual owner could do was collect rent and take the eventual reversion.

The leases in Mid-Cities Mall, however, are conceded by the board to be arms-length leases of a small portion of the mall undertaken with terms, conditions, and rents similar to leases in many other malls at the time they were signed.

In the second case, *People v. Tax Commission of City of New York,* 17 A.D.2d 225, 233 N.Y.S.2d 501 (1962), the New York court simply made a policy choice. The lease was entered into during the depression for twenty-one years with a renewal for an additional twenty-one years at the same rate. The property was sold, while still under the lease, for

$225,000 in 1954. The taxing authority fixed the value at $365,000. The court recognized that:

> "Of course, an outstanding bona fide lease and the rental income established thereby are matters to be considered in determining 'the full value' of the whole property, land and improvements. Value arrived at by capitalization of the fair rental value is, in ordinary cases, the surest guide to a sound appraisal. In that connection, the actual rent realized is significant as an important factor in determining what the fair rental value is. But when there is evidence that factors such as long-term leases made under distress or boom conditions affect the actual rent, the weight to be given to the actual rent must be discounted accordingly." *Id.* at 230, 233 N.Y.S. 2d at 507. (Citations omitted.)

Fluctuating economic conditions are too uncertain and varying in time to determine if a lease was made in a "boom" or "bust" era or to form a basis for passing judgment on the business decisions of persons who are not available to defend those decisions. The value in the presence of long-term leaseholders may be difficult to set since they serve as magnet stores for all other stores in the mall. Also, such long-term leaseholders may give stability to a mall which may or may not be financially attractive depending on continually changing economic circumstances. When agreed to, the square footage charges may very well have been economically attractive for the mall owner and tenant. As one of the board members commented, there was a good possibility that if the original builders of the Mid-Cities Mall had not entered the long-term leases under the terms they did, the mall itself might never have begun construction or started as a business entity. Then the city never would have

had the mall within its tax base. Should the board or this court be allowed to declare the terms of that lease a "bad business decision" simply because overall inflation caused rents to rise in a fashion no one could predict? We reject the invitation of the New York court to require businesspersons to be equipped with precognition; we refuse to second guess their business judgments, as long as such judgments were entered into at arms-length.

The Wisconsin Constitution requires in Article VIII, sec. 1: "The rule of taxation shall be uniform ...." If the city taxes property on the basis of the income the assessor theorizes the property might produce rather than the actual rent the property does produce, the principle of uniform taxation would be violated. Other landowners would be taxed on the basis of what their property will sell for, but the landowner with long-term leases will be taxed on what the assessor believes the land might produce, not what the land will sell for in an arms-length transaction.

We do not hold that actual rents will always control an estimate of property value; however, we hold that actual rents of arms-length leases must be considered as a factor in determining market value. Primarily we hold that a recent arms-length sale of the property is the "best information" to arrive at the full tax assessment value of that property, and capitalization of so-called "market" rent is not the best evidence of value in the presence of such a sale. As the board did not consider the "best information" in arriving at its valuation of the Mid-Cities Mall, we affirm the decision of the court of appeals.

*By the Court.*—The decision of the court of appeals is affirmed.

WILLIAM A. BABLITCH, J. *(dissenting)*. Seventeen states that have considered the issue presented here, *see* Majority Opinion at p. 636 n. 10, including California, New York, Minnesota and Illinois, disagree with the conclusion reached by the majority of this court. Each of those courts support the proposition that fair market rents rather than contract rents are to be used in determining fair market value of income producing properties for tax assessment purposes. The majority cites only one other state which agrees with its conclusion. My research reveals no other. The overwhelming authority disagrees with the majority for good reason.

If the long term leases on this property provided for fair market rents, the property is undisputably worth $5.2 million. However, the leases provided woefully inadequate rents, and therefore the selling price was $1.1 million less than the full value. Because the majority concludes that the full value of the property for purposes of taxation is $4.1 million, $1.1 million worth of otherwise taxable property is removed from the property tax rolls. The property taxes that would have been paid on that additional $1.1 million must now be borne by all other property taxpayers in the City of Manitowoc. The majority says the law compels this result. I think not.

The majority opinion is in error in three respects: 1) it is contrary to the requirement of sec. 70.32(1), Stats., that value be determined at the full value which could ordinarily be obtained at private sale; 2) it is contrary to the requirement of the Wisconsin Property Assessment Manual for Wisconsin Assessors which provides that assessors are to value all rights in the real estate regardless of whether the property owner possesses the entire bundle of rights; and 3) it is

contrary to the objective of uniformity and consistency in taxation. Accordingly, I dissent.

I will address each of these errors in turn.

## I.

Section 70.32(1), Stats., provides in part that real property must be assessed "at the full value which could *ordinarily* be obtained therefor at private sale." (Emphasis added.) Thus, the law recognizes that there are circumstances in which an arms length selling price will not control the determination of full value. Such is the case here. This was far from an "ordinary" sale. Long-term leases provided for rents that were substantially lower than fair market rents. Stores at a comparable competing shopping center across the street were paying rents ranging from $7.50 to $10.00 per square foot. By contrast, the two largest tenants in this property were only paying $1.09 per square foot under leases negotiated in 1968, and which would not terminate until approximately the year 2000. The majority's conclusion necessarily implies that this price was the full value which could "ordinarily" be obtained. Rather than being "ordinary," I assume that this set of circumstances in which contract rents are substantially lower than fair market rents is extraordinary. The "ordinary" sale price would ordinarily reflect that contract rents are substantially equivalent to fair market rents. Because these contract rents are so substantially different from fair market rents, the selling price here is not that which could "ordinarily" be obtained. Thus, we must look further to determine the fair market value. The answer lies in sec. 70.32(1) and the Wisconsin Property Assessment Manual for Wisconsin Assessors.

## II.

Section 70.32(1), Stats., provides that property shall be assessed "in the manner specified in the Wisconsin property assessment manual ...." The Wisconsin Property Assessment Manual for Wisconsin Assessors (the Manual) is prepared by the Wisconsin Department of Revenue. It provides that "even though a property owner may not possess the entire bundle of rights, the value that is being sought is market value ... includes *all* rights and privileges." Wisconsin Assessment Manual for Wisconsin Assessors, 7–2, Dec. 1985. Here, Darcel could not purchase all rights. Darcel was obligated to honor the long-term leases. The lessees, despite the sale, maintained their rights to lease the stores at contract rents that were substantially lower than fair market rents. The value of those rights was presumably $1.1 million, the difference between the value of the property if leased at fair market rent ($5.2 million) and the actual sale price ($4.1 million).

The statute directs that property be assessed according to the Manual. The Manual requires that assessment include the full value of all the rights (referred to as "the bundle of rights") including leasehold interests. The majority, by finding that the full value was the selling price of $4.1 million fails to take into account in any respect the value of the leasehold interest. The $1.1 million dollars worth of property is therefore off the tax rolls. This is not only contrary to Wisconsin law, it is contrary to the conclusion of 17 other states that have decided this issue.

Therefore, I conclude that the statutes as well as the Manual support the finding of the Manitowoc

Board of Review that the full value of this property for tax assessment purposes is $5.2 million. This conclusion is further supported by a longstanding principle: the principle of uniformity and consistency in taxation.

## III.

The Wisconsin Constitution, article VIII, sec. 1, provides that "[t]he rule of taxation shall be uniform ...." This principle has been part of the Wisconsin Constitution since 1848. Section 73.03, Stats., directs the Wisconsin Department of Revenue to provide "more nearly uniform and more consistent assessments of property at the local level."

The Georgia court of appeals succinctly and correctly addressed this concern:

> "If tax assessments on the same property were to fluctuate according to the varying terms of a lease, the computation of ad valorem taxes on the basis of such assessments would result in a tax penalty for one who, through business acumen or fortuity, succeeds in leasing his property for an amount in excess of its 'fair market value' and a tax windfall to one who, through bad business judgment, leases far below his property's 'fair market value.' Such a method of evaluation would hardly produce assessments which were 'fairly and justly equalized' as between taxpayers." *Martin v. Liberty Cty. Bd. of Tax Assessors,* 262 S.E. 2d 609, 612 (Ga. 1979).[1]

---

[1] If these long-term leases provided for substantially higher contract rents than fair market rents, I doubt whether Darcel, Inc. would argue that contract rents should control its assessment.

The error of the majority is readily seen by a hypothetical posed in appellant's brief:

"Assume the following facts: There are two 20 year old shopping centers across the street from each other. They are identical with respect to area, location and all other characteristics, except that one shopping center is encumbered by leases which do not have the flexibility to generate market rents. The leases at this shopping center produce an annual net operating income of $400,000.00. The leases for the other shopping center produce market rents generating an annual net operating income of $600,000.00. Each of the shopping centers is sold on the same date at an arm's length sale price equal to ten times annual net operating income. That is, one shopping center is sold for $4,000,000.00; the other shopping center is sold for $6,000,000.00.

"As the Appellant understands the rationale of the court of appeals, the assessment on one shopping center should be $4,000,000.00 while the assessment on the other shopping center is $6,000,000.00. This would be so even though the physical characteristics of the two shopping centers are identical. The Appellant submits that to limit the assessment on the shopping center encumbered by the bad leases to $4,000,000.00 would violate the uniformity requirements of the Wisconsin constitution and the Wisconsin Statutes." Appellant-petitioner's supreme court brief, pp. 22–23 (June 3, 1986).

I agree.

In conclusion, I would hold that Darcel must pay property taxes based on a value that reflects fair market rents rather than woefully inadequate con-

tract rents, i.e., the assessed value of $5.2 million established by the City of Manitowoc Board of Review.

Would this result lead to an unfair burden on Darcel or others similarly situated? Hardly. The negotiated selling price in a free market will reflect the property taxes that new owners will have to pay notwithstanding unrealized rents from financially inadequate long-term leases. Presumably the selling price to Darcel reflected just that.

Would this result lead to an unfair burden on the seller? Burden? ... yes. Unfair? ... no. The lower selling price results because of the seller's own mis-judgments in negotiating the leases.

Unfortunately, the majority places the burden of the costs of those past misjudgments squarely where it should not rest: on the City of Manitowoc property taxpayers.

Accordingly, I dissent.

I am authorized to state that CHIEF JUSTICE NATHAN HEFFERNAN joins in this dissent.