ADAMS OUTDOOR ADVERTISING, LTD.
d/b/a Adams Outdoor Advertising of Madison,
Plaintiff-Appellant,

v.

CITY OF MADISON, Defendant-Respondent.

Supreme Court

*No. 2005AP508. Oral argument April 26, 2006.
—Decided July 13, 2006.*

2006 WI 104

(Also reported in 717 N.W.2d 803.)

442

446

For the plaintiff-appellant there were briefs by *Thomas S. Hornig, Margery Mebane Tibbetts,* and *Brennan, Steil & Basting, S.C.,* Janesville, and oral argument by *Thomas S. Hornig.*

For the defendant-respondent, there was a brief and oral argument by *Larry W. O'Brien,* assistant city attorney, with whom on the brief was *Michael P. May,* city attorney.

¶ 1. DAVID T. PROSSER, J. This case is before the court on certification by the court of appeals,

pursuant to Wis. Stat. (Rule) § 809.61 (2003–04).[1] The circuit court upheld the City of Madison's (the City) personal property tax assessment of Adams Outdoor Advertising, Ltd. (Adams) billboards for 2002 and 2003, and Adams appealed.[2]

¶ 2. Adams presents essentially four challenges to the assessments:

A. The City erroneously used the third tier income approach to assess Adams' billboards even though evidence of comparable sales was available.

B. Assuming the City could use third tier methods to assess Adams' billboards, the City improperly relied upon only the income approach to assess Adams' billboards, in violation of *Bischoff v. City of Appleton,* 81 Wis. 2d 612, 260 N.W.2d 773 (1978).

C. Assuming the City could use the third tier income approach to assess Adams' billboards, the City erroneously applied the income approach by including the value of the billboard permits in the assessments even though the permits are either intangible personal property or an interest in real property.

D. Use of the third tier income approach to assess Adams' billboards when almost all other personal property in the City is assessed using the cost-less-depreciation approach (the cost approach) contravenes the Uniformity Clause of the Wisconsin Constitution, article VIII, section 1.

¶ 3. We answer Adams' challenges as follows:

---

[1] All references to the Wisconsin Statutes are to the 2003–04 version unless otherwise indicated.

[2] We use the term "billboard" generically to refer to all the various types of outdoor, off-premises signs owned by Adams. An off-premises sign does not advertise the business or activity that occurs on the site where the billboard is located.

A. The City was entitled to use third tier methods of assessment to assess Adams' billboards because there was not a recent arms-length sale of the property and Adams did not produce evidence of reasonably comparable sales.

B. Although net income from billboard rentals may be a factor to consider in a third tier analysis, it cannot be the sole controlling factor in determining value. When the Madison City Assessor acknowledged that he considered but rejected all other approaches and factors, his assessment contravened long-standing assessment principles articulated in *Waste Management of Wisconsin, Inc. v. Kenosha County Board of Review*, 184 Wis. 2d 541, 558, 516 N.W.2d 695 (1994); *Bischoff*, 81 Wis. 2d at 619; and *State ex rel. I.B.M. Corp. v. Board of Review*, 231 Wis. 303, 311–12, 285 N.W. 784 (1939), as well as the prevailing practice for assessing billboards throughout Wisconsin and the United States.

C. The City erred by including the value of billboard permits in the assessment of Adams' billboards. Billboard permits are not tangible personal property. For property tax purposes, billboard permits constitute an interest in real property, as defined by Wis. Stat. § 70.03.

D. Having concluded that the City's assessment is improper because it relied on only an income approach and because it improperly included the value of billboard permits, we do not reach the question of whether the City's use of the income approach violates the Uniformity Clause.

¶ 4. Accordingly, we reverse the circuit court and remand the cause to the circuit court, which is directed to stay further proceedings pending reassessment of Adams' billboards by the City in a manner consistent with this opinion, or until the parties reach a settlement.

## I. BACKGROUND

¶ 5. Adams challenges as excessive the City's personal property tax assessments of its billboards for the years 2002 and 2003. The City assessed Adams' billboards at $6,022,400 in 2002 and $5,858,000 in 2003.[3] In 2002 and 2003 Adams owned 109 billboard structures in the City, according to an appraisal prepared for Adams. These structures presented "206 billboard faces," according to the Madison assessor. All billboard structures were on leased land.

¶ 6. Adams timely challenged the 2002 and 2003 assessments before the City Board of Assessors and then the City Board of Review.[4] For both years, Adams claimed the fair market value of its billboards was $401,984. Adams' fundamental objection to the City's assessments was that they included value attributable to elements other than tangible personal property, including the location of the billboards and the billboard permits.[5]

---

[3] Adams' personal property tax bill for 2002 was $141,283.10. Adams' personal property tax bill for 2003 was $135,786.10. The difference in assessment was due to the net loss of three billboards between 2002 and 2003.

[4] In 2002 the City's original valuation was $5,815,900. When Adams objected, the City Board of Assessors increased the assessment of Adams' billboards to $6,022,400. The City Board of Review upheld the Board of Assessors' increase. In 2003 the City Board of Assessors reduced the assessment of Adams' billboards from $6,625,000 to $5,858,000, an amount that the City Board of Review sustained.

[5] A prerequisite to constructing and operating a billboard is a permit issued by the City. Because the City strictly limits the number of billboard permits despite increasing demand for advertising space, a significant amount of value inheres in a

¶ 7. After Adams failed to obtain meaningful relief from the Board of Review, Adams timely commenced actions against the City in Dane County Circuit Court pursuant to Wis. Stat. § 74.37(3)(d). The circuit court consolidated the 2002 and 2003 actions and held a three-day trial July 27–29, 2004, from which this appeal ensued.

¶ 8. Since 1994 the City has used the income approach to value billboards. Under the income approach, an assessor seeks to convert future benefits likely to be derived from property into an estimate of present market value. *See Waste Mgmt.,* 184 Wis. 2d at 541. Using the income approach, the assessor first determines the net annual income from personal property, such as billboards. This figure is reached by deducting from gross income "the leasehold interest in the land," all typical operating expenses, and income attributed to something other than the personal property. Then the assessor sets a capitalization rate and applies this rate to the net annual income to determine the expected income stream over the economic life of the billboards. *Id.; see also* 1 *Property Assessment Manual for Wisconsin Assessors,* ch. 7 at 7–27 to 7–28 and ch.9 at 9–11 to 9–25 (hereinafter, *Property Assessment Manual*).

¶ 9. Prior to 1994, the City appraised billboards using the cost approach. Under the cost approach the total cost required to reproduce a billboard is determined and from this amount depreciation is subtracted. *Vivid, Inc. v. Fiedler,* 219 Wis. 2d 764, 783, 580 N.W.2d 644 (1998); *see also* 1 *Property Assessment Manual,* ch. 7 at 7–22 to 7–25 and 9–11.

---

permit. *Cf.* Ron L. Nations & Donald P. Oehlrich, *The Valuation of Billboard Structures,* Appraisal J. 412, 420 (Oct. 1999).

¶ 10. The City switched from the cost approach to the income approach in 1994 after receiving an appraisal supplied by Adams as part of Adams' inverse condemnation lawsuit against the City. In the early 1990s, the City began actively restricting the number of billboards within the City pursuant to Wis. Stat. § 84.30. To establish its damages, Adams commissioned an appraisal from Ruppert and Ruppert, Inc. (the Condemnation Appraisal). The Condemnation Appraisal used the income approach and valued Adams' billboards within the City at approximately $5,000,000.

¶ 11. The Condemnation Appraisal prompted the City to re-think how it assessed billboards. In 1994, using the income approach, the City initially assessed Adams' billboards at $5,000,000, up from assessments of no more than $2,000,000 in the previous three years.[6] Since 1994, the City's assessments of Adams' billboards have steadily increased using the income approach.

¶ 12. At trial, Adams emphasized how unusual it is to use the income approach to value billboards. Testimony revealed that other than Madison, the only jurisdictions in the nation that use the income approach are Sun Prairie and La Crosse. Additionally, testimony revealed that within the City, billboards are the only personal property assessed using the income approach, except certain buildings on leased property.

¶ 13. Although the above facts are undisputed, the parties, through their expert witnesses, fiercely contest the proper assessment methodology. Consequently, it is necessary to briefly summarize the testimony of the parties' experts.

---

[6] After Adams contested the assessment, the City eventually reduced the 1994 assessment to $3,032,000.

¶ 14. The City's Chief Assessor, Michael Kurth (Kurth), testified that he appraised Adams' billboards using the income approach because there were no recent arms-length sales of the billboards and no reasonably comparable sales information. Kurth explained that in deriving the amount of income attributable to the billboard structures he determined Adams' total income and then subtracted the value of the leasehold interest, the income attributable to Adams' art and advertising-development department, and Adams' operating expenses. According to Kurth, the result of these calculations equaled the net income attributable to the billboard structures and the billboard permits. To this figure, Kurth then applied a capitalization rate of 14% to calculate the true cash value of the billboards.

¶ 15. Additionally, Kurth's testimony addressed the cost approach. First, he explained that he rejected the cost approach because he believed the true cash value of Adams' billboards was greater than the cost of its components. According to Kurth, the cost to construct a billboard does not reflect how the industry calculates the fair market value of billboards. Second, he criticized the calculations of Adams' expert (Rodolfo Aguilar) under the cost approach as omitting several significant costs, including site procurement costs, design costs, and permit costs, thereby significantly undervaluing Adams' billboards.

¶ 16. Adams presented three expert witnesses: Rodolfo Aguilar (Aguilar), Mark Ulmer (Ulmer), and Donald Sutte (Sutte). Adams' experts testified that either the market approach (comparable sales) or the cost approach should be used to appraise billboards for personal property tax assessments. None of these experts, however, presented evidence of comparable sales. Only Aguilar provided affirmative testimony as to the

value of Adams' billboards. Using the cost approach, Aguilar valued Adams' 109 billboard structures in the City at $1,565,100.

¶ 17. Aguilar, Ulmer, and Sutte were all critical of the City's use of the income approach. All three concluded that the City improperly included the income-producing value of the billboard permits—"intangibles," they argued—in the personal property tax assessments, thereby overvaluing Adams' billboards. All three testified that the cost approach is the preferred method to value billboards for purposes of property tax assessment. Nonetheless, the testimony of both Ulmer and Sutte suggested that the income attributable to just the physical structure of the billboards could be determined.

¶ 18. Based on this testimony, the circuit court concluded, first, that the purpose of an appraisal does not drive which valuation method must be used (i.e., the cost approach versus the income approach), because the objective when assessing property for both condemnation and property tax purposes is to determine the property's fair market value. The court noted, however, that regardless of the method used, non-taxable items must be excluded from any tangible personal property tax assessment.

¶ 19. Second, the circuit court concluded that the City's use of the income approach was proper because it factored out all income attributable to Adams' business value and to the real estate leaseholds upon which the billboards are anchored.

¶ 20. Third, the court concluded that the City's inclusion of the billboard permits and the location of the billboards in the assessment was proper, even if permits and location are intangible, because the per-

mits and location are inextricably intertwined with the physical structure of the billboards.

¶ 21. Fourth, the circuit court concluded that use of the income approach did not result in double taxation.

¶ 22. Finally, the circuit court concluded that use of the income approach rather than the cost approach did not violate the Uniformity Clause, because both methods are intended to achieve the same result, the full fair market value of the property.

¶ 23. Adams appealed, and the court of appeals certified the following questions:

> 1. In the absence of a recent sale of the subject property and sales of other reasonably comparable properties, does the law require a taxing authority to use the "cost less depreciation" method instead of the "income" method when valuing an outdoor advertising sign for personal property tax purposes?
>
> 2. Should the appraisal methods used in eminent domain cases be recognized in personal property tax assessment cases?
>
> 3. Should the "[inexplicably] intertwined" approach used in real estate tax assessment cases be recognized in personal property tax assessment cases?
>
> 4. Is a permit authorizing the location of an outdoor advertising sign an "intangible" within the meaning of Wis. Stat. § 70.112(1) and therefore an exempt factor for purposes of personal property tax assessment?
>
> 5. Does the Uniformity Clause, article VIII, section 1 of the Wisconsin Constitution and the language of *State ex rel. Baker Manufacturing Co. v. City of Evansville,* 261 Wis. 599, 53 N.W.2d 795 (1952), require that

similar property be assessed under the same methodology or merely require that the fraction of the value taxed be the same?

## II. STANDARD OF REVIEW

¶ 24. This is a review of a circuit court's decision on an action commenced under Wis. Stat. § 74.37(3)(d). When we review a claim of an excessive tax assessment under § 74.37(3)(d), we review the record made before the circuit court, not the board of review. *See Nankin v. Village of Shorewood,* 2001 WI 92, ¶ 25, 245 Wis. 2d 86, 630 N.W.2d 141; *Bloomer Hous. Ltd. P'ship v. City of Bloomer,* 2002 WI App 252, ¶ 11, 257 Wis. 2d 883, 653 N.W.2d 309.

¶ 25. The circuit court may make its determination without regard to any determination made at any earlier proceeding, *Nankin,* 245 Wis. 2d 86, ¶ 25, and without giving deference to any determination made at a previous proceeding. *Id.* This court, like the circuit court, must give presumptive weight to the City's assessment. Wis. Stat. § 70.49(2). However, the assessment is presumed correct only if the challenging party does not present significant contrary evidence. *Bloomer Housing,* 257 Wis. 2d 883, ¶ 11.

¶ 26. Failure to make an assessment on the statutory basis is an error of law. *State ex rel. Boostrom v. Bd. of Review,* 42 Wis. 2d 149, 155–56, 166 N.W.2d 184 (1969). Whether the City followed the statute in making its assessment is a question of statutory interpretation that we review de novo. *See State v. Waushara County Bd. of Adjustment,* 2004 WI 56, ¶ 14, 271 Wis. 2d 547, 679 N.W.2d 514.

¶ 27. The circuit court conducted a trial that included expert testimony. Where there is conflicting testimony the fact finder is the ultimate arbiter of credibility. "The weight and credibility to be given to the opinions of expert witnesses is 'uniquely within the province of the fact finder.'" *Bloomer Housing,* 257 Wis. 2d 883, ¶ 12. Applying the law to the facts presents a question of law that we review independently of the circuit court.

### III. OVERVIEW

¶ 28. At trial, the expert witness testimony revealed substantial disagreement over the most accurate method to assess the true cash value of billboards absent an arms-length sale of the subject property or evidence of reasonably comparable sales. Adams contends the cost approach must be used, whereas the City maintains the income approach is proper and that the cost approach does not reflect the true cash value of billboards.

¶ 29. The disagreement over how to value billboards is reflected in the scholarly literature and appraisal trade journals. However, a recent article, and one of the few articles that specifically addresses property tax assessment of billboards, notes that "any of the accepted approaches to value, income, sales, or cost, *may* be used[,]" but that the emerging trend is to use the cost approach. Cris K. O'Neall & Bradley R. Marsh, *Trends in the Property Tax Valuation of Commercial Outdoor Advertising Structures,* J. of Prop. Tax Assessment & Admin. 5, at 7, 11 (Vol. 1, Issue 2, 2004) (emphasis added).

¶ 30. Neither the Wisconsin Statutes nor the *Property Assessment Manual* mandates either the cost

approach or the income approach. Nevertheless, we begin with an overview of the assessment framework established by the statutes, the *Property Assessment Manual,* and case law.

¶ 31. Property taxes must be levied upon all real and personal property in this state, except property that is exempt from taxation. Wis. Stat. §§ 70.01 and 70.02. Real property is "not only the land itself but all buildings and improvements thereon, and all fixtures and rights and privileges appertaining thereto[.]" Wis. Stat. § 70.03. Personal property includes "all goods, wares, merchandise, chattels, and effects, of any nature or description, having any real or marketable title, and not included in the term 'real property,' as defined in s. 70.03." Wis. Stat. § 70.04. Billboards are taxed as personal property. 1 *Property Assessment Manual,* ch. 15 at 15–13.

¶ 32. Property tax exemptions abound.[7] Exemptions are found primarily in three statutes, Wis. Stat. §§ 70.11, 70.111, and 70.112. One exemption is at issue in the present case. Section 70.112(1) exempts: "Money and all intangible personal property, such as credit, checks, share drafts, other drafts, notes, bonds, stocks and other written instruments." Adams and the City disagree over whether billboard permits fall within the intangible personal property exemption.

¶ 33. There is no dispute that billboards are personal property, subject to the personal property tax.

---

[7] Given the proliferation of exemptions, the legislature has sought to limit how the exemptions are interpreted by creating a presumption of taxability. Wis. Stat. § 70.109. Section 70.109 states: "Exemptions under this chapter shall be strictly construed in every instance with a presumption that the property in question is taxable, and the burden of proof is on the person who claims the exemption."

The questions presented concern how an assessor should arrive at the value of a billboard and what elements of the billboard may be included in the assessment. Wisconsin Stat. § 70.34 provides that "[a]ll articles of personal property shall, as far as practicable, be valued by the assessor upon actual view at their true cash value[,]" and that assessments should be performed in accordance with the *Property Assessment Manual*.[8]

¶ 34. The *Property Assessment Manual* and case law set forth a three-tier assessment methodology to ascertain true cash value. *See State ex rel. Markarian v. City of Cudahy*, 45 Wis. 2d 683, 686, 173 N.W.2d 627 (1970); 1 *Property Assessment Manual*, ch. 7, at 7–18, ch. 21, at 21.3–16. Evidence of an arms-length sale of the subject property is the best evidence of true cash value. *State ex rel. Keane v. Bd. of Review*, 99 Wis. 2d 584, 590, 299 N.W.2d 638 (Ct. App. 1980) (citing *State ex rel. Geipel v. City of Milwaukee*, 68 Wis. 2d 726, 733–34, 229 N.W.2d 585 (1975)). If there has been no recent sale of the subject property, an assessor must consider sales of reasonably comparable properties. *Id.* Only if there has been no arms-length sale and there are no reasonably comparable sales may an assessor use any of the third-tier assessment methodologies. *Id.*

[8] The term "true cash value" means the same thing as fair market value. *State ex rel. Mitchell Aero, Inc. v. Bd. of Review*, 74 Wis. 2d 268, 277, 246 N.W.2d 521 (1976); 1 *Property Assessment Manual*, ch. 21, at 21.4–1 (noting "the basis for valuing personal property should be same as real property,"). Thus, the true cash value of the billboards is that which they would sell for "upon arms-length negotiation in the open market, between an owner willing but not obliged to sell, and a buyer willing but not obligated to buy." *Mitchell Aero*, 74 Wis. 2d at 277.

¶ 35. Within tier three, an assessor may consider "all the factors collectively which have a bearing on value of the property in order to determine its fair market value." *Markarian,* 45 Wis. 2d at 686; 1 *Property Assessment Manual,* ch. 21, at 21.3–16. These factors include "cost, depreciation, replacement value, income, industrial conditions, location and occupancy, sales of like property, book value, amount of insurance carried, value asserted in a prospectus and appraisals produced by the owner." *State ex rel. Mitchell Aero, Inc. v. Bd. of Review,* 74 Wis. 2d 268, 278, 246 N.W.2d 521 (1976); *see* 1 *Property Assessment Manual,* ch. 21, at 21.3–16 to 21.3–20, 21.4–11. The income approach, which seeks to capture the amount of income the property will generate over its useful life, and the cost approach, which seeks to measure the cost to replace the property, both fit into this analytic framework. 1 *Property Assessment Manual,* ch. 21, at 21.3–16.

## IV. DID THE CITY ERR BY NOT CONSIDERING COMPARABLE SALES?

¶ 36. Adams does not contend the City should have used the first assessment tier. Adams acquired the majority of its billboards in the City in 1987, at a time when the regulatory environment in the City was in flux. The price Adams paid for the billboards 15 years earlier is not indicative of their true cash value in 2002 and 2003. Adams does argue, however, that the City failed to consider evidence of comparable sales.

¶ 37. If there were reasonably comparable sales, but the City used the income approach, the assessments would be invalid. *State ex rel. Keane,* 99 Wis. 2d at 590; *Markarian,* 45 Wis. 2d at 686. Upon review of the

record, we conclude the City did not err by using tier three assessment methodology.

¶ 38. In response to Adams' objection to the 2002 assessment, Assessor Kurth filed an Objection Report dated November 15, 2002. The report stated in part:

> There is no sale of the subject property nor are there sales of reasonably comparable properties.
>
> . . . .
>
> The City of La Crosse Assessor has informed me of a recent sale of a set of billboards containing eight faces. These eight faces sold for an allocated value of $301,200 or $37,650 per face.

¶ 39. In response to Adams' objection to the 2003 assessment, Assessor Kurth filed an Objection Report dated September 17, 2003. It repeated word-for-word the statements on comparable sales from the 2002 Objection Report.

¶ 40. On July 20, 2004, Assessor Kurth signed a Supplemental Report that elaborated on the 2002 and 2003 objection reports. This Supplemental Report was introduced at trial. The report states that "[r]easonably comparable sales do not exist." The report lists six sales, including the billboards Adams purchased in Madison in 1987. Two of the documented sales occurred in 2001, both less than a year before the first assessment in 2002.[9] The Supplemental Report lists the source of the six sales as the City of La Crosse Assessor's Office.

¶ 41. The Supplemental Report states: "The outdoor advertising industry and valuation experts indicate in various articles and books that the sales com-

---

[9] We note that the reported sales information for the eight billboard faces sold in 2001 differs between the 2002 and 2003 objection reports and the Supplemental Report.

461

parison approach using a gross income multiplier is a relevant approach to determine the market value of outdoor advertising signs. . . . Sales of outdoor advertising structures do exist in the State of Wisconsin."

¶ 42. Kurth went on to list four reasons why he did not consider the sales he had cited in the discussion of the sales comparison approach to be reasonably comparable sales: (1) the sales information was becoming dated; (2) the sales information lacked details about the nature of the billboard structures sold; (3) the sales were of a comparatively small number of billboards, limiting the usefulness of the information; and (4) he had concerns about the accuracy of the information and calculations used to compute the income produced by the billboards.

¶ 43. Adams did not present significant contrary evidence to overcome the presumptive weight of the assessor's report and testimony. Its experts stressed that comparable sales data was available but they failed to provide any comparable sales.[10]

---

[10] When asked about comparable sales, Donald Sutte testified: "I believe—I have not researched, but from my understanding, there are sales in Wisconsin that are for both permits and land leases." Sutte never produced evidence of such sales.

Likewise, consultant and attorney Mark Ulmer testified:

> [T]here is an active market out there of purchase and sale of billboard structures standing alone as items of tangible personal property. It's typical appraisal theory . . . when direct comparable sales exist, that you don't even go the next step, you don't get to an income based approach.

Ulmer, however, never produced evidence of such sales. At oral argument Adams' attorney confirmed that Adams did not present evidence of comparable sales, other than that its experts testified that comparable sales existed.

¶ 44. We note that at the 2003 City Board of Review hearing, Adams' appraiser, Craig Hungerford, testified: "There [are] no comparable sales that we're aware of at this time; therefore, the cost approach is the most reliable approach."

¶ 45. Based on the Supplemental Report and Kurth's testimony, the circuit court found that Kurth's reasons for dismissing the sales as not reasonably comparable were entitled to presumptive weight and concluded the City correctly used the income approach, a third tier assessment methodology.

¶ 46. Adams' chief complaint on this point is that the City did not do enough to actively seek out comparable sales information.[11] Yet Adams did nothing to provide assistance. Adams' own expert, Mark Ulmer, has written:

> [B]illboards are commonly erected on leased land; consequently, when billboards sell, they are transferred by assignment of lease or bill of sale, rather than by warranty deed recorded in the public record. Many appraisers, therefore, are not aware of billboard trans-

---

[11] We too have reservations about the City Assessor's efforts to discover comparable sales information and his willingness to dismiss the information he did have as not reasonably comparable. For instance, we question what efforts the City Assessor made to obtain evidence of reasonably comparable sales; whether he obtained the other sales information from the La Crosse Assessor before or after the 2002 assessment; whether he attempted to obtain details about the size, age, illumination, or daily circulation of the signs from the La Crosse Assessor or any other source; and why two sales within a year of the 2002 assessment were viewed as out of date. Adams, however, did not ask these or similar questions of Kurth and did not present evidence sufficient to overcome the presumption of correctness that attached to Kurth's conclusion that the sales were not reasonably comparable.

fers nor do they have ready access to sales data for billboard transactions, so they are unable to apply the comparable sales approach.

8A *Nichols on Eminent Domain* § 23.04[4], at 23–62 (3d ed. 2005); *see also* O'Neall & Marsh, *supra* at 7 (noting the difficulties associated with relying upon comparable sales); Jill S. Gelineau, *Valuation of Billboards in Condemnation,* 19 No. 4 Prac. Real Est. Law. 23, 30 (July 2003) (noting that data on billboard values are difficult to obtain).

■

¶ 47. An assessor has an obligation to follow the three tier assessment analysis. In terms of comparable sales of billboards, however, neither the City nor Adams seems particularly anxious to use this information. One insists that reasonably comparable sales are not available but makes no serious effort to find them; one assures us that the information is available but then makes no serious effort to provide it. Under the circumstances, we are bound to uphold the decision of the circuit court that the City was entitled to rely upon tier three valuation methods.

## V. DID THE CITY IMPROPERLY USE ONLY THE INCOME APPROACH?

■

¶ 48. On several occasions we have stated that an assessment cannot be based solely upon the income approach. *E.g., Waste Mgmt.,* 184 Wis. 2d at 558; *Bischoff,* 81 Wis. 2d at 619; *I.B.M.,* 231 Wis. at 312. This rule reflects the fact that variables other than income-generating capability influence fair market value. Absent relevant sales information "an assessor must determine market value from the best information the

assessor can practicably obtain, considering all elements which collectively have a bearing on the value of the property." *Waste Mgmt.,* 184 Wis. 2d at 557; *see* 1 *Property Assessment Manual,* ch. 21, at 21.4–11. Elements bearing upon fair market value include "cost, depreciation, replacement value, income, industrial conditions, location and occupancy, sales of like property, book value, amount of insurance carried, value asserted in a prospectus, and appraisals procured by the owner." *Waste Management,* 184 Wis. 2d at 557; *see I.B.M.,* 231 Wis. at 311–12.

¶ 49. Adams argues that the City used only the income approach to value its billboards. The City does not disagree, although it contends that it reached its assessment after considering the alternative methods of comparable sales and the cost approach and rejecting them.

¶ 50. The rule against the exclusive use of the income approach originated in *Wahl v. H.W. & S.M. Tullgren, Inc.,* 222 Wis. 306, 310, 267 N.W. 278 (1936). *See Bldgs. Dev. Co. v. City of Milwaukee,* 225 Wis. 357, 359, 274 N.W. 298 (1937) (interpreting *Wahl* as holding that income alone cannot control the determination of fair market value). In *Wahl* the plaintiff, who was interested in securing a low appraisal of an apartment building, urged this court to reverse the fair market value determined by the circuit court for the reason that the income-generating capability of the building did *not* support the circuit court's finding. *Wahl,* 222 Wis. at 309–10. The court rejected the plaintiff's contention, concluding that the fair market value based upon the income approach was not consistent with the original purchase price or the reproduction cost of the building, both of which were much greater. *Id.* at 310.

¶ 51. Implicit in *Wahl* is the court's concern that reliance upon a single factor in determining fair market value may result in skewed appraisals due to aberrant market conditions. *See id.* The reason the income approach yielded a low valuation of the building in *Wahl* was that it was the middle of the Great Depression and monthly rent for apartments was one-third to one-half the rent obtained prior to the Depression. *Id.* The lesson from *Wahl* and its progeny is that an assessor must consider all factors relevant to fair market value to ensure that an assessment is not skewed.

¶ 52. The *Property Assessment Manual* reflects the need to consider all factors that bear upon fair market value. "Usually, more than one—and often all three—of the approaches apply to a given property." 1 *Property Assessment Manual,* ch. 7, at 7–18. "The only limiting factor: whether available and appropriate data exists to develop any and all approaches." *Id.*

¶ 53. There may be situations in which the only information available compels an assessor to use a single methodology to assess property. *See* 1 *Property Assessment Manual,* ch. 7, at 7–28.[12] In any event, an assessor must have the ability to discount, even disregard, factors that do not really bear on the value of a property. *See State ex rel. Kesselman v. Bd. of Review,* 133 Wis. 2d 122, 129–30, 394 N.W.2d 745 (Ct. App. 1986). The

---

[12] The *Property Assessment Manual,* ch. 7, at 7–28 provides:

The appraiser should *consider* all three approaches [sales, cost, and income] when estimating the value of a property. However, all three approaches may not be developed in an appraisal because a sufficient amount of data may not be available or, due to the specific property characteristics, the approach may be considered less reliable in estimating market value. If more than one approach is developed in the appraisal, the individual value estimates must be reconciled into one final value estimate for the property.

*Property Assessment Manual* directs appraisers to use the assessment methodology or methodologies that are most reliable. 1 *Property Assessment Manual,* ch. 7, at 7–28. The *Property Assessment Manual* states:

> The best guidance that can be offered is to review market activity for the subject and determine the attributes by which the *market* uses to evaluate alternative real estate decisions. Generally, the greatest weight should be placed on the approach for which the greatest amount of reliable and appropriate data is available that will yield the highest degree of confidence.

1 *Property Assessment Manual,* ch. 7, at 7–28.

¶ 54. Where there is sufficient data to estimate market value under both the income and cost approaches, "[a]ssessors should select a final estimate of value through the process of 'reconciliation.' " *Id.* at 7–18. Reconciliation requires an assessor to evaluate the data available under the alternative approaches and decide whether to derive the value from one of the approaches or a combination of approaches. *Id.*

¶ 55. In this case, we think that we would nullify the so-called *Bischoff* rule if we permitted the City assessor to reject all approaches and factors other than an income approach. We think it extraordinary that the assessor rejected out of hand such factors as cost, depreciation, replacement value, and insurance carried. The City assessor concluded, in effect, that the Wisconsin Supreme Court in *Vivid* (approving cost approach), the Wisconsin Department of Revenue in three revenue rulings (approving cost approach), the assessors in most communities in Wisconsin (using cost approach), and rulings in other states approving the cost approach,

were simply irrelevant. Thus, the City Assessor deemed unreliable the cost approach, a method that nearly all jurisdictions use to assess billboards.[13]

¶ 56. We consider the City assessor's failure to consider collectively all the factors, especially cost-less-depreciation, that reasonably affected the value of Adams' billboards a failure to follow the *Property Assessment Manual* and the rulings of this court. No presumption of correctness may be accorded to an assessment that does not apply the principles in the *Property Assessment Manual*. The circuit court upheld that presumption, notwithstanding Adams' full-blown appraisal and all of Adams' expert testimony. Under the facts of the present case, the City improperly relied upon only the income approach to assess Adams' billboards, in violation of *Bischoff,* 81 Wis. 2d at 619, and in contravention of the directive in the *Property Assessment Manual* to reconcile the applicable approaches to value.

---

[13] In order to conclude the income approach was proper the dissent emphasizes appraisal articles that discredit the cost approach as unreliable. Dissent, ¶¶ 108–114. As we have recognized, *supra,* ¶ 29, there is substantial disagreement over how to value billboards. For every article promoting the income approach, there is a contrary article extolling the virtues of the cost approach. *See e.g.,* James Wagner & David Baker, *The Valuation of Outdoor Advertising Structures: A Mass Appraisal Approach,* Assessment Digest, July/Aug. 1991, at 4 (concluding the cost approach is "justifiable as the best available method for the valuation of off-premise outdoor advertising structures"); Charles F. Floyd, *Outdoor Advertising Signs & Eminent Domain Proceedings,* Real Est. Appraiser & Analyst, Summer 1990, at 11, 14 (concluding "the cost approach is the only valid technique for valuing outdoor advertising signs").

468

## VI. DID THE CITY ERRONEOUSLY APPLY THE INCOME APPROACH BY INCLUDING THE VALUE OF THE BILLBOARD PERMITS IN ITS ASSESSMENT?

¶ 57. This question encompasses three of the questions certified by the court of appeals:

2. Should the appraisal methods used in eminent domain cases be recognized in personal property tax assessment cases?[14]

3. Should the "inextricably intertwined" approach used in real estate tax assessment cases be recognized in personal property tax assessment cases?

4. Is a permit authorizing the location of an outdoor advertising sign an "intangible" within the meaning of Wis. Stat. § 70.112(1) and therefore an exempt factor for purposes of personal property tax assessment?

### A. A Billboard Permit is Real Property

¶ 58. We address the issue of billboard permits first. Adams contends that billboard permits are either (1) an interest in real property under Wis. Stat. § 70.03 or (2) intangible personal property and not taxable as personal property under Wis. Stat. § 70.112(1). Either way, Adams concludes, the result is the same: the value of billboard permits cannot be included in the assessment of billboards. In response, the City contends the classification of the permits is immaterial, because the

---

[14] We agree with Adams' statement during oral argument that the thrust of this certified question is better understood as asking *what property should be included* in an assessment for purposes of establishing fair market value in an eminent domain proceeding as compared to a personal property tax assessment.

value attributable to the permits is inextricably intertwined with the billboard structures and therefore properly included in the assessments of the billboards.

¶ 59. We conclude that a billboard permit is a right or privilege appertaining to real property and thus falls within the definition of "real property" in Wis. Stat. § 70.03. A billboard permit is not tangible personal property within the definition of "personal property" in Wis. Stat. § 70.04. If a billboard permit were to be considered personal property, it would be exempted from property taxation as an intangible by Wis. Stat. § 70.112(1).

¶ 60. Whether the City could include the value of the billboard permits in its personal property tax assessments is a question of statutory interpretation. As always, "statutory interpretation begins with the language of the statute." *State ex rel. Kalal v. Circuit Court for Dane County*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. When the meaning of a statute is plain, the inquiry ordinarily stops. *Id.* We conclude the statutory scheme established by Wis. Stat. ch. 70 unambiguously precludes billboard permits from being taxed as personal property.

¶ 61. In determining whether a billboard permit can be taxed as personal property, the first question is whether permits are personal property. To answer this question we turn to Wis. Stat. § 70.04, which states:

> Definition of personal property. The term "personal property", as used in chs. 70 to 79, shall include all goods, wares, merchandise, chattels, and effects, of any nature or description, having any real or marketable value, and not included in the term "real property", as defined in s. 70.03.

470

(1) Personal property also includes toll bridges; private railroads and bridges; saw logs, timber and lumber, either upon land or afloat; steamboats, ships and other vessels, whether at home or abroad; ferry boats, including the franchise for running the same . . . .

Three aspects of § 70.04 demonstrate that a billboard permit, which represents an intangible right to use land in a specific manner, does not fall within the definition of personal property.

¶ 62. First, Wis. Stat. § 70.04 defines personal property by means of a list of general types of property, including "goods, wares, merchandise, chattels, and effects," all of which have tangible characteristics and have "real or marketable value" because of their corporeal existence. By contrast, the value of a billboard permit lies not in the piece of paper qua paper, but in the right to construct a billboard upon designated land, which the paper represents. Applying the canon of ejusdem generis,[15] we interpret § 70.04 to include only tangible personal property, to the exclusion of intangible property such as permits, licenses, most franchises, patents, copyrights, trademarks, and the like.

[21]

¶ 63. Second, Wis. Stat. § 70.04(1) corroborates the conclusion that billboard permits do not fall within the definition of personal property. Subsection (1) lists specific examples of personal property. Of the list, only one item is not tangible—a ferry boat franchise. If "personal property" included permits, licenses, and "fran-

---

[15] "Ejusdem generis is a 'canon of construction that when a general word or phrase follows a list of specific persons or things, the general word or phrase will be interpreted to include only persons or things of the same type as those listed.'" *State v. A.S.*, 2001 WI 48, ¶ 33 n.4, 243 Wis. 2d 173, 626 N.W.2d 712 (quoting *Black's Law Dictionary* 535 (7th ed. 1999)).

■■■■■■■

chises," the statute would not have listed a "ferry boat franchise." To avoid rendering this provision surplusage, we interpret the term "personal property" (which is subject to property taxation) to exclude intangible property, with the exception of ferry boat franchises.

¶ 64. Third, Wis. Stat. § 70.04 excludes from the definition of personal property anything that falls within the definition of real property in Wis. Stat. § 70.03. In part, § 70.03 defines real property as "not only the land itself but . . . all fixtures and rights and privileges appertaining thereto[.]" Because a billboard permit confers a right or privilege to erect and operate a billboard on a designated piece of land and because a permit cannot be transferred to a different location, we conclude a billboard permit falls within the definition of real property.[16]

B. As a General Rule, a Permit Is Intangible Personal Property

¶ 65. The fourth certified question asked: "Is a permit authorizing the location of an outdoor advertis-

---

[16] The *Property Assessment Manual* helps to explain why a billboard permit is real property:

> To value real property the assessor must know what real property is. In the process of valuing real property, the assessor will encounter the terms "real estate" and "real property." Real estate refers to the physical items; the land and any structures and improvements located on the land. Real property is the rights, privileges, and benefits of owning the real estate. These two terms are often misused and misunderstood used interchangeably. For assessment purposes real property is defined in Section 70.03, Stats., as follows: "The terms 'real property', 'real estate' . . . shall include not only the land itself but all buildings and improvements thereon, and all fixtures and rights and privileges appertaining thereto." Thus, in Wisconsin assessment law real property encompasses the definitions of both real estate and real property.

1 *Property Assessment Manual,* ch. 7, at 7–1.

ing sign an 'intangible' within the meaning of Wis. Stat. § 70.112(1) and therefore an exempt factor for purposes of personal property tax assessment?"

¶ 66. We conclude that a billboard permit should be assessed as a right or privilege appertaining to real property under Wis. Stat. § 70.03. As a result, we need not respond to the certified question with a "yes" or "no" answer. Nonetheless, if a failure to comment on intangibles were to leave the impression that the answer is "no," we would create a misleading impression of Wis. Stat. § 70.112(1) and open the door to argument on inextricable intertwinement.

¶ 67. Wisconsin Stat. § 70.112(1) exempts from personal property taxation "all intangible personal property." "[A]ll intangible personal property" is an exceptionally broad classification. Its plain language suggests a clear policy choice to exempt "intangible personal property" from personal property taxation. We see no reason on the face of the statute to give the term a narrow reading.

¶ 68. There is a solid historical basis to support this interpretation of Wis. Stat. §§ 70.04 and 70.112(1). A century ago personal property was more broadly defined than it is today. In 1900 Wis. Stat. § 1036 read as follows:

> Personal property defined. Section 1036. The term "personal property" as used in this title shall be construed to mean and *include*
>
> Toll bridges,
>
> Saw logs, timber and lumber, either upon land or afloat;
>
> Steamboats, ships and other vessels, whether at home or abroad;

Buildings upon leased lands, if such buildings have not been included in the assessment of the land on which they are erected;

Ferry-boats, including the franchise for running the same;

Ice cut and stored for use, sale or shipment;

*All debts due from solvent debtors, whether on account, note, contract, bond, mortgage or other security, or whether such debts are due or to become due;*

And all goods, wares, merchandise, chattels, moneys and effects, of any nature or description, having any real or marketable value, and included in the term real property as above defined. (Emphasis added.)

¶ 69. This text covered some, if not all, intangibles. In *State ex rel. Dwinnell v. Gaylord,* 73 Wis. 316, 41 N.W. 521 (1889), this court approved a personal property tax assessment on $14,000 of a taxpayer's "moneys" in Nebraska managed for the taxpayer by his son-in-law. In *Kingsley v. City of Merrill,* 122 Wis. 185, 99 N.W. 1044 (1904), the court approved the taxation of notes and mortgages. In *State ex rel. Milwaukee Street Railway Co. v. Anderson,* 90 Wis. 550, 63 N.W. 746 (1895), the court approved the assessment of a street railway franchise in Milwaukee. Among other things, the court said that "the franchises of the street railway company are property." *Id.* at 559. "Franchises are classed as incorporeal hereditaments." *Id.* at 560. "We have the general and paramount provision making franchises taxable. . . . [T]he cardinal requirement is that, as property, they shall be taxed." *Id.* at 562.

¶ 70. In a "Report of the Taxation Committee of the Wisconsin Legislative Council," December 1950, the Committee recounted the history of the personal prop-

erty tax in Wisconsin. The report indicates that the personal property tax had consistently been the subject of hostile criticism, in part because of its uneven administration. A tax commission set up in 1898 revealed that intangibles escaped taxation almost entirely. The formal exemption of intangibles began in piecemeal fashion in 1903 with the exemption of mortgages. A 1907 Report of the Wisconsin Tax Commission singled out intangibles as the class of personal property "for the most immediate and drastic action of exemption." In 1909 Governor James O. Davidson advocated the abolition of the personal property tax on intangibles and the establishment of an income tax.

¶ 71. In Chapter 658, Laws of 1911, an income tax was created and "all moneys, all debts due or to become due to any person, and all stocks and bonds not otherwise specially provided for" were exempted.

¶ 72. The 1911 statute did not use the word "intangibles." That word was added by Chapter 63, Laws of 1949, in legislation requested by the Legislative Council. Chapter 63 created Wis. Stat. § 70.112, which exempted: "Money and Intangible Personalty. Money and all intangible personal property, such as credit, checks, notes, bonds, stocks and other written instruments."

¶ 73. The 1950 Legislative Council Report made two significant observations in relation to this case. First, "[t]he Wisconsin personal property tax has been transformed over the years from a tax on tangible and intangible, income-producing and non-income-producing property into *a tax wholly on tangible* and largely *on income-producing property*." (Emphasis added.) This statement reinforces our interpretation of Wis. Stat. § 70.04. Second, "there seems little doubt that

the income tax was designed as an eventual replacement for the entire personal property tax."

¶ 74. With respect to the second point, Wis. Stat. § 70.112 is now entitled "Property exempted from taxation because of special tax." This title is explained by Rick Olin in a "Study of the Treatment of Personal Property Under the Property Tax" (Legislative Fiscal Bureau, Sept. 2002). Olin writes: "[S]ection 70.112 . . . exempts certain types of real estate and personal property from the property tax because the property is subject to another tax or fee . . . Such property includes money and intangibles (income tax) . . . . In 1911, the creation of the state income tax provided a rationale for fully exempting intangible property . . . from the property tax." Olin, *supra,* at 3.

¶ 75. *Black's Law Dictionary* 809 (6th ed. 1990) defines "Intangible Property." "As used chiefly in the law of taxation, this term means such property as has no intrinsic and marketable value, but is merely the representative or evidence of value, such as certificates of stock, bonds, promissory notes, copyrights, and franchises." "Intangibles" is defined as "[p]roperty that is a 'right' such as a patent, copyright, trademark, etc., or one which is lacking physical existence; such as goodwill." *Black's Law Dictionary* 809 (6th ed. 1990).

¶ 76. *Black's Law Dictionary* 1233 (7th ed. 1999) has a different definition of "Intangible Property:" "Property that lacks a physical existence." Additionally, "Intellectual Property" is defined as "1. A category of intangible rights protecting commercially valuable products of the human intellect. The category comprises primarily trademark, copyright, and patent rights . . . ." *Id.* at 813.

476

¶ 77. Intangibles have a paramount place in contemporary society. They are integrally related to both the heavily regulated and wholly entrepreneurial facets of our modern economy. They include the intellectual property that is essential to creativity, branding, and information technology. Wisconsin Stat. § 70.112 exempts from personal property taxation "*all* intangible personal property," ranging from patents to permits, as well as money substitutes. (Emphasis added.) Any decision to tax intangible personal property should be made by the legislature, not local assessors.[17]

C. The Inextricably Intertwined Concept Does Not Apply in the Context of Personal Property Tax Assessments

¶ 78. Regardless of our conclusion that billboard permits are real property, the City contends it is permissible to include the value of the permits in the personal property tax assessments. The City argues the income attributable to billboard permits is inextricably intertwined with the physical structure of the billboards, so that it can be included in the assessment, just as the management income in *ABKA Limited Partner-*

---

[17] The dissent disagrees with this analysis. It cites *State ex rel. Dane County Title Co. v. Board of Review,* 2 Wis. 2d 51, 85 N.W.2d 864 (1957), which determined that title records are not "intangible personal property." The court described the records in an abstract office as "a completely indexed collection of authentic notes and memoranda of all public records relating to grants, judgments, liens, etc., for use in the preparation of abstracts of title or for title-policy purposes." *Id.* at 60. These records were obviously tangible in that they presented substantial questions of weight and space. We have no difficulty in distinguishing tangible title records from billboard permits.

*ship v. Board of Review,* 231 Wis. 2d 328, 344, 603 N.W.2d 217 (1999), and the income attributable to the landfill license in *Waste Management,* 184 Wis. 2d at 568, were included in real property assessments. In short, the City argues permits can be included in personal property tax assessments because a permit is necessary for a billboard to be operational, meaning the permits are inextricably intertwined with the physical structure of the billboards.

¶ 79. We conclude that the City's reliance upon the inextricably intertwined concept is misplaced. The concept of inextricable intertwinement allows business value to be included within the assessment of real property where the income-generating capability can be transferred with the real estate. *ABKA,* 231 Wis. 2d at 336; *Waste Mgmt.,* 184 Wis. 2d at 563; *State ex rel. N/S Assocs. V. Board of Review,* 164 Wis. 2d 31, 54, 473 N.W.2d 554 (Ct. App. 1991). When business value is transferable with the underlying real estate, the business value is appended to the real estate rather than attributable to the personal skill and expertise of the owner. *ABKA,* 231 Wis. 2d at 336; *Waste Mgmt.,* 184 Wis. 2d at 563; *N/S Assocs.,* 164 Wis. 2d at 54.

¶ 80. A review of the cases leading up to *ABKA* demonstrates that inclusion of business value in a property assessment should be the exception, not the norm. *See ABKA,* 231 Wis. 2d at 344 (cautioning that for income to be included in an assessment it must be attributable primarily to the nature of the property); *Waste Mgmt.,* 184 Wis. 2d at 565 (inclusion of business value "permissible only in very limited circumstances under sec. 70.32(1)"). Only business value related "primarily to the nature of" the property may be included; business value attributable to another source must be

excluded from real property assessments. *ABKA,* 231 Wis. 2d at 344; *Waste Mgmt.,* 184 Wis. 2d at 566, 570 (requiring income attributable to labor and skill to be factored out).

¶ 81. In *ABKA, Waste Management,* and *N/S Associates,* the courts confronted the question whether business value was attributable primarily to the underlying real estate or to the business skill and acumen of the property owner. In all three cases, the courts determined the value was attributable to the underlying real estate. Integral to the analysis in these cases was the conclusion that the income appertained to the real property under Wis. Stat. § 70.03, and therefore, was a proper element to include in the real estate assessment under Wis. Stat. § 70.32(1). *See ABKA,* 231 Wis. 2d at 344; *N/S Assocs.,* 164 Wis. 2d at 55.

¶ 82. The conclusions in these cases depend upon the definition of real property in Wis. Stat. § 70.03, which includes "all buildings and improvements thereon, and all fixtures and *rights and privileges* appertaining thereto[.]" (Emphasis added.) Thus, in *ABKA* the management income derived from adjacent real estate could be included in the assessment because the physical proximity and interdependency of the real estate meant the income was a privilege appertaining to the subject real estate, rather than the product of the owner's skill and business acumen. Likewise, in *Waste Management,* the right to generate income from the landfill appertained to the nature of the real estate rather than the labor and skill of the owner. Finally, in *N/S Associates* the right to receive rental income appertained to the nature and location of the mall rather than to the unique qualities of the mall's ownership.

¶ 83. The valuation of Adams' billboards for purposes of a personal property tax assessment presents

the court with a different set of circumstances from those presented in *ABKA, Waste Management,* and *N/S Associates.* Rather than a question of whether the income is primarily attributable to the real estate or the personal business skill and acumen of the real property owner, the issue here is whether the income is primarily attributable to real property or personal property.

¶ 84. We conclude that because billboard permits are real property, as defined in Wis. Stat. § 70.03, the income attributable to them is properly included in the real property tax assessment, not the personal property tax assessment.[18] Any value attributable to the billboard permits is not inextricably intertwined with the structure of the billboards. The primary value of the permits is unrelated to the structures; rather, the primary value of the permits appertains to the location of the underlying real estate.

¶ 85. The nature of billboard permits demonstrates the correctness of this conclusion. Billboard permits are valid for a designated location only. A permit terminates when a billboard is moved. Whether value appertains to property depends upon the property's inherent capacity to generate income. *ABKA,* 231 Wis. 2d

---

[18] Our conclusion does not mean that the City can include 100 percent of the income derived from Adams' billboards in the real property tax assessment of the land that is leased to Adams and upon which Adams places its billboards. The amount of rental income a property can generate is a proper factor to consider when assessing property under the income approach. *See Darcel, Inc. v. City of Manitowoc Bd. of Review,* 137 Wis. 2d 623, 633 n.7, 405 N.W.2d 344 (1987). Because the rent the underlying landowner can charge Adams is but a fraction of Adams' income from the billboards, our decision does not shift 100 percent of the tax burden from Adams to the landowner.

at 341. Applying this analysis to billboards, it is apparent that business value primarily inheres in the permit and the location, which are real property (the permit) or features of real property (location). Value primarily inheres in the permit because the City has severely restricted the number of permits, artificially driving up their value. Likewise, the value of a billboard is heavily dependent upon its location, as demonstrated by the fact that a billboard along a heavily traveled interstate highway can command a much greater price for the display of advertising than a billboard in a residential neighborhood. *See Vivid,* 219 Wis. 2d at 780 (Bablitch, J., with two justices joining); *see also N/S Assocs.,* 164 Wis. 2d at 53.

¶ 86. The City argues that it is immaterial whether the billboard permit is considered "tangible" or "intangible." In its brief, the City states that "[t]he City has shown that the value of the permit is *inextricably intertwined* with the structure and that its value is transferable to a subsequent owner." (Emphasis added.) However, if we were to allow the permit, which the City concedes is intangible, to be factored into an assessment of personal property by means of the inextricably intertwined concept, we would undermine the legislature's decision to exempt intangible personal property, as expressed in Wis. Stat. §§ 70.04 and 70.112(1).

D. The Property Valued in a Personal Property Tax Assessment Is More Limited Than the Property Valued for Eminent Domain

¶ 87. "'There are three recognized valuation methods for billboards: cost approach, income approach and market approach." *Vivid,* 219 Wis. 2d at 783 (citing 8A *Nichols on Eminent Domain* § 23.04[4], at 23–51 to

23–59). These three methods are equally applicable to establish fair market value in eminent domain cases, *id.,* and to establish true cash value for personal property tax assessments. *Mitchell Aero,* 74 Wis. 2d at 279; *I.B.M.,* 231 Wis. at 311–12; *see also* O'Neall & Marsh, *supra* at 7.

¶ 88. Although the same appraisal methods may be used to establish fair market value for condemnation purposes as may be used to establish true cash value for purposes of personal property tax assessments, the property valued differs depending upon the purpose. *See* 8A *Nichols on Eminent Domain* § 23.04[3], at 23–50 n.7 (3d ed. 2005). In eminent domain, fair market value of a billboard is the price "the aggregate asset—the lease, permit and sign—would bring in the market-place[.]" *Vivid,* 219 Wis. 2d at 780 (Bablitch, J., with two justices joining). Necessarily, this includes the value attributable to the location of the billboard. *Id.* at 803–04 (Bradley, J., with three justices joining) (noting the value of the location is included in the value of the leasehold).

¶ 89. In contrast, an appraisal for personal property tax assessment purposes includes only the value of personal property, and therefore excludes the value of the leasehold and billboard permit. *See* Wis. Stat. §§ 70.04 and 70.34. Because Adams' experts, Donald Sutte and Mark Ulmer, and the City's chief assessor, Michael Kurth, all testified that income attributable to the billboard structures could be isolated, we conclude that a per se rule against the use of the income approach to appraise billboards for property tax assess-

ment is not necessary.[19] In fact, once it is shown that a market approach is not available, the income approach "is always a proper element to *consider*[.]" *I.B.M.*, 231 Wis. at 312 (emphasis added).

¶ 90. Therefore, we conclude the same methods of appraisal may be used in eminent domain as are used in appraising personal property for tax purposes, *provided* care is taken to exclude from a personal property tax assessment any value attributable to elements other than tangible personal property.

## VII. DOES THE CITY'S USE OF THE INCOME APPROACH TO VALUE BILLBOARDS VIOLATE THE UNIFORMITY CLAUSE?

¶ 91. Because it is necessary to remand the cause for the City to reassess Adams' property, we need not reach Adams' constitutional challenge. *Labor & Farm*

---

[19] Creation of a per se rule dictating how billboards should be valued smacks of an administrative or legislative decision. We leave the decision of whether to adopt a per se rule that the cost approach should be the exclusive method to value billboards to the Department of Revenue or the legislature, as have other states. *See e.g.,* California State Board of Equalization, Property and Special Taxes Dept., *Guidelines for the Assessment of Billboard Properties,* No. 2002/078 at 2 (Dec. 2002), *available at* http://www.boe.ca.gov/proptaxes/pdf/lta02078.pdf (last visited July 10, 2006) (adopting the cost approach); Nev. Admin. Code § 361.1305 (2006) (adopting the cost approach); State of New Jersey, Dep't of the Treasury, Div. of Taxation, *Real Property Appraisal Manual for New Jersey Assessors* 71.02 (Feb. 2005), *available at* http://www.state.nj.us/treasury/taxation/pdf/lpt/billboardpacket.pdf (last visited July 10, 2006) (noting the income, market, and cost approaches are all available to value billboards).

*Party v. Elections Bd.,* 117 Wis. 2d 351, 354, 344 N.W.2d 177 (1984) ("This court does not normally decide constitutional questions if the case can be resolved on other grounds.").

## VIII. CONCLUSION

¶ 92. In sum, we conclude as follows:

A. The City was entitled to use third tier methods of assessment to assess Adams' billboards because there was not a recent arms-length sale of the property and Adams did not produce evidence of reasonably comparable sales.

B. Although net income from billboard rentals may be a factor to consider in a third tier analysis, it cannot be the sole controlling factor in determining value. When the Madison City Assessor acknowledged that he considered but rejected all other approaches and factors, his assessment contravened long-standing assessment principles articulated in *Waste Management,* 184 Wis. 2d at 558; *Bischoff,* 81 Wis. 2d at 619; and *I.B.M.,* 231 Wis. at 312, as well as the prevailing practice for assessing billboards throughout Wisconsin and the United States.

C. The City erred by including the value of billboard permits in the assessment of Adams' billboards. Billboard permits are not tangible personal property. For property tax purposes, billboard permits constitute an interest in real property, as defined by Wis. Stat. § 70.03.

D. Having concluded the City's assessment is improper because it relied on only an income approach and because it improperly included the value of billboard permits, we do not reach the question of whether the City's use of the income approach violates the Uniformity Clause.

¶ 93. Accordingly, we reverse the circuit court and remand the cause to the circuit court, which is directed to stay further proceedings pending reassessment of Adams' billboards by the City in a manner consistent with this opinion, or until the parties reach a settlement.

*By the Court.*—The judgment of the circuit court is reversed and the cause is remanded for further proceedings consistent with this opinion.

¶ 94. SHIRLEY S. ABRAHAMSON, C.J. (*dissenting*). I agree with the circuit court's excellent decision. I conclude, as did the circuit court after reviewing all the evidence presented at trial, that the City of Madison properly assessed Adams's billboards using the income approach, after considering various approaches to valuation. The obvious purpose of an outdoor sign is for public display in a desirable location. As the circuit court stated, "A billboard does not generate income sitting in a warehouse; its value is a function of its permit and its location. That income-generating capacity is inextricably intertwined with the billboard and its value must be captured if, as Wisconsin law requires, the property is to be assessed at its full market value."

¶ 95. Accordingly, the personal property tax assessments challenged in the instant case are valid assessments, and I therefore dissent.

I

¶ 96. I begin with the method of assessment used by the City. The majority opinion, like the circuit court, correctly states the law regarding the various methods of personal property tax assessment. Both the circuit court and the majority opinion correctly conclude that

485

the City was entitled to use the "third tier" assessment methods to assess the billboards.[1]

¶ 97. The majority opinion is also correct that when conducting a third tier assessment, the income approach "cannot be considered as the sole controlling factor in determining value of either real or personal property."[2] "[A]n assessor must determine market value from the best information the assessor can practicably obtain, considering all elements which collectively have a bearing on the value of the property."[3] When the assessor uses more than one approach to assessment, he must reconcile the values determined by the various approaches. However, when other approaches are properly rejected and only one approach is used, obviously no reconciliation is needed.[4]

---

[1] Majority op., ¶ 47.

[2] *Bischoff v. City of Appleton,* 81 Wis. 2d 612, 619, 260 N.W.2d 773 (1978) (quoting *State ex rel. I.B.M. Corp. v. Bd. of Review,* 231 Wis. 303, 312, 285 N.W. 784 (1939)); *see* majority op., ¶ 48; 1 *Property Assessment Manual for Wisconsin Assessors,* ch. 7, at 7–28 ("The appraiser should *consider* all three approaches when estimating the value of a property. However, *all three approaches may not be developed* in an appraisal because a sufficient amount of data may not be available or, *due to the specific property characteristics, the approach may be considered less reliable* in estimating market value." (second and third emphasis added)); *see also Waste Mgmt. of Wis., Inc. v. Kenosha County Bd. of Review,* 184 Wis. 2d 541, 558, 516 N.W.2d 695 (1994) ("Income may never be the sole basis for an assessment of property.").

[3] *Waste Mgmt.,* 184 Wis. 2d at 558.

[4] 1 *Property Assessment Manual,* ch. 7, at 7–28 ("If more than one approach is developed in the appraisal, the individual value estimates must be reconciled into one final value estimate for the property. . . . The final value estimate may be the value estimate derived from one of the approaches or may be a careful

¶ 98. As the majority opinion observes, the purpose of requiring assessors to consider all elements that bear on the value of property is to prevent "skewed appraisals due to aberrant market conditions."[5] The majority opinion properly recognizes, however, that the limiting factor is that data may not be available or appropriate to develop any and all approaches.[6] According to the majority opinion, "an assessor must have the ability to discount, *even disregard,* factors that do not really bear on the value of a property."[7] I wholeheartedly agree. And the present case falls right into this situation.

¶ 99. Unfortunately, the majority opinion does not apply the rules of assessment it espouses. Indeed, after stating that an assessor may disregard factors that do not bear on the value of the property, the majority opinion shifts, concluding that the rule requiring an assessor to consider all elements that bear on the market value would be nullified if the assessor were permitted "to reject all approaches and factors other than an income approach" because he "deemed unreliable" other approaches.[8]

¶ 100. Which is it? Either the assessor can disregard other approaches when they are inappropriate, or he cannot.

¶ 101. The record developed in the circuit court is clear that the City considered several third tier assess-

reconciliation of the applicable approaches.") Thus the majority opinion's emphasis, ¶ 54, on reconciliation in the instant case is irrelevant.

[5] Majority op., ¶ 51.

[6] Majority op., ¶¶ 52–54.

[7] Majority op., ¶ 53 (emphasis added).

[8] Majority op., ¶ 55.

ment methods. The record demonstrates that after considering a variety of approaches, the assessor had a sufficient basis to use the income approach for the assessment and to disregard other approaches as not reliable and as producing a skewed fair market value. The other approaches were disregarded after careful consideration; none was rejected out of hand, as the majority opinion states.[9] The circuit court opinion details the record demonstrating the City's careful analysis in rejecting the cost approach. I conclude that the assessor's rejection of approaches and factors that were not reliable in the instant case comports with long-standing assessment principles articulated in the cases and the rule stated in the majority opinion.[10]

---

[9] Majority op., ¶ 55.

[10] *See, e.g., Waste Mgmt.*, 184 Wis. 2d at 557 ("[A]n assessor must determine market value from the best information the assessor can practicably obtain, considering all elements which collectively have a bearing on the value of the property. Such elements, as identified by various decisions of this court, include, among others, cost, depreciation, replacement value, income, industrial conditions, location and occupancy, sales of like property, book value, amount of insurance carried, value asserted in a prospectus, and appraisals procured by the owner." (citations omitted)); *State ex rel. Kesselman v. Bd. of Review for Village of Sturtevant*, 133 Wis. 2d 122, 129, 394 N.W.2d 745 (1986) (same); *Rosen v. City of Milwaukee*, 72 Wis. 2d 653, 663, 242 N.W.2d 681 (1976) (same); *State ex rel. Park Plaza Shopping Center, Inc. v. Bd. of Review for City of Madison*, 61 Wis. 2d 469, 474, 213 N.W.2d 27 (1973) (same); *Superior Nursing Homes, Inc. v. City of Wausau, Bd. of Review*, 37 Wis. 2d 570, 575, 155 N.W.2d 670 (1968) (same); *State ex rel. Garton Toy Co. v. Town of Mosel*, 32 Wis. 2d 253, 259–260, 145 N.W.2d 129 (1966) (same); *State ex rel. Mitchell Aero, Inc. v. Bd. of Review of City of Milwaukee*, 74 Wis. 2d 268, 277, 246 N.W.2d 521 (1976) ("The method of valuation generally has been to assess both personal and real property on the basis of its fair market value; i.e., the

¶ 102. The City determined that there were no recent arms-length sales.[11] Adams did not proffer evi-

amount it will sell for upon arms-length negotiation in the open market, between an owner willing but not obliged to sell, and a buyer willing but not obliged to buy."); *Xerox Corp. v. DOR,* 114 Wis. 2d 522, 527, 339 N.W.2d 357 (1983) (same); *State ex rel. Geipel v. City of Milwaukee,* 68 Wis. 2d 726, 733, 229 N.W.2d 585 (1975) ("Commonly stated, sec. 70.32(1) requires real estate to be assessed at its fair market value which has often been defined as the amount the property could be sold for in the open market by an owner willing and able but not compelled to sell to a purchaser willing and able but not obliged to buy."); *State ex rel. Kesselman v. Bd. of Review for Village of Sturtevant,* 133 Wis. 2d 122, 128–129, 394 N.W.2d 745 (1986) ("In the absence of such sales, the assessor may consider all the factors collectively which have a bearing on value of the property in order to determine its fair market value. . . . Among these factors are costs, depreciation, replacement value, income, industrial conditions, location and occupancy, sales of like property, book value, amount of insurance carried, value asserted in a prospectus and appraisals procured by the owner."); *State ex rel. Markarian v. City of Cudahy,* 45 Wis. 2d 683, 686, 173 N.W.2d 627 (1970) (same); *Buildings Development Co. v. City of Milwaukee,* 225 Wis. 357, 359–60, 274 N.W. 298 (1937) (quoting *State ex rel. North Shore Development Co. v. Axtell,* 216 Wis. 153, 155–157, 256 N.W. 622 (1934)) ("Elements besides income proper to consider in assessing property are . . . 'costs, depreciation, replacement value, earnings, industrial conditions,' and 'location of the property relative to the business section of the city.' "); *State ex rel. Flambeau Paper Co. v. Windus,* 208 Wis. 583, 587, 243 N.W. 216 (1932) ("[I]n fixing valuation [take] into account cost, depreciation, replacement value, earnings, industrial conditions, and sales of . . . properties. These are factors entering into sale value, and proper to consider in judging it."); *Duesterbeck v. Town of Koshkonong,* 2000 WI App 6, ¶ 27, 232 Wis. 2d 16, 605 N.W.2d 904 ("[Section] 70.32(1), stats., . . . requires assessment based on real estate's fair market value, using the most reliable information that the assessor can practicably obtain.").

[11] *See* majority op., ¶ 38.

dence of reasonably comparable sales.[12] The majority opinion in effect concedes that although the City attempted to use comparable sales, neither the City nor Adams offered any at trial.[13]

¶ 103. The two approaches at issue in the instant case are the "cost approach" and the "income approach." The cost approach is a measurement of the replacement cost of the property. The income approach is a measurement of the amount of income the property will generate over its useful life.[14]

¶ 104. The City assessor considered the cost approach and determined that it was not a reliable way to determine the fair market value. In the City's supplemental report regarding the 2002 and 2003 assessments, relying on the Wisconsin Property Assessment Manual and citing to expert authority, the City describes its valuation methodology as considering, but rejecting, the cost approach as follows:

> Due to the lack of complete, accurate cost data, the cost approach is not considered a reliable approach to value and is not considered in this valuation. Most sources agree that the cost approach does not reflect the fair market value of outdoor advertising signs.

. . . .

---

[12] *See* majority op., ¶¶ 39–47, ¶ 43 n.10, ¶ 46 n.11.

[13] Majority op., ¶ 47. The comparable sales approach has been described as "fraught with numerous difficulties, all of which militate against use of this approach for property tax valuation of billboards." Cris K. O'Neall & Bradley R. Marsh, *Trends in the Property Tax Valuation of Commercial Outdoor Advertising Structures,* J. of Prop. Tax Assessment & Admin. 5, 7 (vol. 1, issue 2, 2004).

[14] Majority op., ¶ 35.

The cost approach is not considered a reliable indicator of value for the subject property due to the following reasons:

The age of the improvements and constant maintenance and upkeep makes it almost impossible to estimate reproduction or replacement cost and appropriate depreciation and obsolescence.

It is very difficult or almost impossible to estimate appropriate soft costs, site procurement costs and entrepreneurial profits which are needed to put the billboard into productive use as required by the Wisconsin Property Assessment Manual.

All sources reviewed considered the cost approach to be the least reliable approach to value for outdoor advertising signs, the lowest value indicator, and not an accurate reflection of market value.

The materials of the sign do not influence its value. Rather, location is of paramount importance in outdoor advertising. A location of a particular billboard may have a value over and above its nuts and bolts value. In this sense, in the billboard industry, it is virtually impossible to separate location from the structure.

The sign structure and appropriate rights associated with the sign structure are inextricably intertwined and cannot be properly valued using the cost approach.

¶ 105. Thus, the record in the trial court is clear that the City did not use the income approach as the sole controlling factor in determining the value of personal property, and it is clear that the majority opinion is misleading in suggesting that the City assessor rejected the cost approach "out of hand."[15]

¶ 106. Other states allow use of the income approach. The critics of the income approach recognize

---

[15] *See* majority op., ¶ 55.

that the income approach is valid. The criticisms are primarily that the income approach is difficult to implement.[16]

¶ 107. The journal article relied upon by the majority opinion to conclude that the cost approach is the emerging trend is totally unconvincing.[17] The article has to be read knowing that both authors "specialize in representing owners in property tax assessment matters."[18] They conclude that the cost approach is the best approach for tax assessment purposes.[19]

¶ 108. There are several more substantive reasons not to take this article very seriously. The authors'

---

[16] *See, e.g.,* James Wagner & David Baker, *The Valuation of Outdoor Advertising Structures: A Mass Appraisal Approach,* Assessment Digest, July/Aug. 1991, at 4 ("Advantages of using the cost approach in the valuation of off-premise signs are: (1) the ease of application; (2) the ability to determine the value of the structure irrespective of location, income, and expenses attributable to the business as opposed to the structure; and (3) the availability of cost data."); Charles F. Floyd, *Outdoor Advertising Signs and Eminent Domain Proceedings,* Real Estate Appraiser & Analyst, Summer 1990, at 16 ("Traditionally, the cost approach is the appraisal technique that has been utilized to value outdoor advertising signs in eminent domain proceedings. It has been accepted by the courts as a valid technique, and it has been accepted by most courts as the ONLY valid technique for valuing outdoor advertising signs. The sole exception arises when evidence indicates that the sign cannot be relocated within the entire market area. In this situation several courts have ruled that some variation of the income approach may be used.").

In the instant case, however, the assessor was able to determine the market value of the billboards using the income approach and the signs cannot be relocated easily in Madison.

[17] *See* majority op., ¶ 29.

[18] O'Neall & Marsh, *supra* note 13, at 5.

[19] *Id.* at 11.

conclusion about any emerging trend toward the cost approach is not supported by the evidence presented in the article.

¶ 109. The authors surveyed a mere six states.[20] One of the six states was Wisconsin, which is not described as adopting any of the three approaches.[21] Two of the six states expressly allow an income approach. In California, income value may be used; if the cost approach is used a cost new value is given to the property, depreciation is subtracted, and the value of land is determined (using comparable sales) and added.[22] In Ohio, cost is prima facie evidence of value unless evidence to the contrary is brought by the taxing authority or taxpayer.

¶ 110. Regardless, the examples from the six states are unconvincing because four of the six states discussed, California, Ohio, Texas, and North Carolina, provide nothing more than examples of recommended guidelines by an agency with no authority to mandate appraisal approaches. They do not discuss what is actually happening in those states.[23] Thus we cannot determine from the article the billboard assessment rules in the six states or any other states.

¶ 111. Furthermore, any normative conclusions reached by the authors must be rejected in Wisconsin because the authors' view of the proper approach to valuation conflicts with Wisconsin law. The authors reject the "sales approach" as unreliable.[24] In Wisconsin, however, it has long been the rule that the "sales

---

[20] *Id.* at 8–11.

[21] *Id.* at 11.

[22] *See id.* at 8–9, 10.

[23] *Id.* at 8–9, 10–11.

[24] *Id.* at 7.

approach," valuing the property based on recent or comparable sales, is the best approach to valuation. Only when sales information is not available, as in the instant case, may an assessor proceed to the third tier approaches.[25]

¶ 112. Moreover, other commentators reject the normative conclusions in this article. A commentator relied upon by the majority opinion,[26] who is a member of a private law firm and apparently represents condemnees rather than condemnors and at least one billboard company, concludes that the cost approach is appropriate for determining the value of billboards in only rare circumstances. This commentator has observed that there are several problems with the cost approach:

> The cost approach has at least three major shortcomings:
>
> -It does not reflect market thinking: Buyers and sellers of outdoor advertising do not consider the replacement cost of a sign, minus depreciation, as an accurate estimate of value when they purchase signs.
>
> -Depreciation may be impossible to estimate: Because sign companies are continually refurbishing sign structures, standard methods of estimating physical depreciation cannot be applied to outdoor signs. In addition, cost estimating services do not develop age-life tables for signboards as they do for other categories of real estate. Moreover, economic obsolescence attributable to negative external influences is extremely difficult, if not impossible, to estimate.
>
> -Replacement cost may not reflect value: The replacement cost of a sign can be estimated quite readily. The actual cost to build a sign can be determined from

---

[25] Majority op., ¶¶ 34, 37.

[26] Majority op., ¶ 46.

contractors' estimates or bids. However, the cost of acquiring the site for sign usage must also be reflected in the cost estimate. Companies continually acquire new sites for outdoor advertising. To complicate matters further, associated costs for items such as entrepreneurial profit must be estimated.

Because of these serious shortcomings, use the cost approach only in the rarest of circumstances.[27]

¶ 113. The same commentator also espouses the virtue of using the income approach for determining the value of billboards, contending that the income approach encompasses the full value and nature of the billboard:

The true value of an outdoor advertising sign depends on a host of factors. Many of these characteristics make the valuation of billboards similar to the appraisal of commercial real estate generally. Signs are purchased for their locations, the signboard structures themselves, and the land leases that run with the sites on which the signs stand. These interests are similar to the real estate interests involved in the purchase of an apartment building, office building, or commercial center, which usually include the location, the physical structure(s), and the right to use the land under the lease agreement. Attributes such as advertising potential are related to locational interests. Location is of prime importance to all real estate assets, whether the real estate is residential, commercial, or industrial. This is equally true of the interests in outdoor advertising signboards.

---

[27] Jill S. Gelineau, *Valuation of Billboards in Condemnation,* 19 No. 4 Practical Real Estate Lawyer 23, 30–31 (July 2003) (also observing that the value of a billboard is tied to location, permit, and physical structure and that billboards are arguably real property, not personal property, in eminent domain cases).

The similarities between billboards and other commercial property interests, such as office buildings, restaurants, and the like, suggest that billboards are properly viewed as real property.[28]

¶ 114. The expert opinions cited by the City in its supplemental report on the 2002 and 2003 assessments support the proposition that the cost approach is unreliable for billboards. An article written by one of Adams's expert witnesses explains that the income approach appropriately captures the value of a billboard because, unlike other businesses, the income-producing capacity cannot be separated from the physical structure:

It is ... incorrect to assert that the income approach reflects the "business" value of a billboard. The expense data, which include all operating and management costs, effectively eliminate the "business" component from the income figures. ... An outdoor advertising structure is not a restaurant or a fast food outlet, where a separate and distinct business activity is conducted such as selling food and beverages. All activities of a sign owner relate directly to its being rented to a tenant-advertiser, a purely real estate related function.[29]

[28] Gelineau, *supra* note 27, at 27.

[29] Rodolfo J. Aguilar, *The Appraisal of Off-Premise Advertising Billboards,* Right of Way, September/October 2000, at 12 (publication of the Int'l Right of Way Ass'n, http://www.irwaonline.org/).

For further discussion of the relative benefits of the income approach compared to the cost approach in determining the value of a billboard, see also other authorities cited by the City in the supplemental report, Donald T. Sutte, *The Appraisal of Outdoor Advertising Signs* 41 (1994) (stating same reasons as Gelineau to explain why cost approach is inappropriate for billboards); Ron L. Nation & Donald P. Oehlrich, *The Valuation of Billboard Structures,* The Appraisal Journal, October 1999,

¶ 115. Taking into account the fact that the City considered and rejected approaches other than the income approach and the fact that the income approach is a proper approach to assessing property for tax purposes, I conclude that the City's decision to use only the income approach was proper.

## II

¶ 116. I must now consider whether the City properly applied the income approach. The circuit court concluded, and I agree, that the City properly applied the income approach, including the "inextricably inter-twined" concept. I agree with the circuit court that the City had eliminated from its income approach any elements improper in assessing the billboards as personal property.[30]

¶ 117. In the real property context, this court has held that "certain business value may in fact be 'appended' to the real estate rather than personal to the owner."[31] This value is appended to real property when it is inextricably intertwined with the land.[32]

---

at 412 (publication of the Appraisal Institute, http://www.appraisalinstitute.org/) (discussing inadequacy of cost approach in determining value of billboard).

[30] The majority opinion concludes that "the same methods of appraisal may be used in eminent domain as are used in appraising personal property for tax purposes, *provided* care is taken to exclude from a personal property tax assessment any value attributable to elements other than tangible personal property." Majority op., ¶ 90.

[31] *Waste Mgmt.*, 184 Wis. 2d at 564.

[32] *See ABKA Ltd. P'ship v. Bd. of Review of Village of Fontana-On-Geneva-Lake,* 231 Wis. 2d 328, 336, 344, 603 N.W.2d 217 (1999); *Waste Mgmt.,* 184 Wis. 2d at 564; *State ex rel.*

¶ 118. The majority opinion asserts that the "inextricably intertwined" concept is not applicable here because the billboard permit is "a right or privilege appertaining to real property and thus falls within the definition of 'real property' in Wis. Stat. § 70.03."[33] The majority opinion asserts that the "inextricably intertwined" concept is not applicable here because the billboard permit is an interest in real property and the income attributable to the permits is properly included in the real property tax assessment, not the personal property tax assessment. Therefore, concludes the majority opinion, the permit cannot be inextricably intertwined with personal property (the billboard).

¶ 119. The majority opinion remarkably also explains that a billboard permit is both real property and intangible personal property.[34]

---

*N/S Assocs. v. Bd. of Review of Village of Greendale,* 164 Wis. 2d 31, 54–55, 473 N.W.2d 554 (Ct. App. 1991).

[33] Majority op., ¶ 59. *See also* majority op., ¶ 64 ("[A] billboard permit falls within the definition of real property."); ¶ 66 ("[A] billboard permit should be assessed as a right or privilege appertaining to real property under Wis. Stat. § 70.03."); ¶ 79 ("Regardless of our conclusion that billboard permits are real property . . . ."); ¶ 85 ("We conclude that because billboard permits are real property, as defined in Wis. Stat. § 70.03, the income attributable to them is properly included in the real property tax assessment, not the personal property tax assessment").

[34] The majority opinion states that it does not want to "leave the impression that the answer is 'no' " to the question of whether a billboard permit is " 'intangible' within the meaning of Wis. Stat. § 70.112(1)," that is, whether a billboard permit is intangible personal property. Majority op., ¶¶ 65–66.

I assume that because the majority does not want to leave the impression that the answer is "no" because it would be "misleading," it must conclude that the answer is "yes."

¶ 120. Although the cases addressing the inextricably intertwined rule are real property cases, I agree with the circuit court that the same rationale applies to personal property taxation.[35] "[T]he 'key to the analy-

The explanation in the majority opinion that permits are, as a general rule, intangible personal property excluded from property taxation is untenable. *See* majority op., ¶¶ 65–77. This conclusion does not comport with the text of Wis. Stat. § 70.112(1), defining personal property that is exempt from property taxation, or the cases interpreting the statute.

Wisconsin Stat. § 70.112(1) exempts from property taxation "[m]oney and all intangible personal property, such as credit, checks, share drafts, other drafts, notes, bonds, stocks and other written instruments." In *State ex rel. Dane County Title Co. v. Board of Review, City of Madison,* 2 Wis. 2d 51, 62, 85 N.W.2d 864 (1957), this court applied the principle of *ejusdem generis* and concluded that " 'written instruments' as used in sec. 70.112(1), Stats., refers to writings that evidence rights and obligations of things involving money credits."

The majority opinion does not explain how a permit can be classified as a "money credit." Indeed, in explaining that a permit is generally non-taxable intangible personal property under § 70.112(1), the majority does not apply *Dane County Title,* the foundational supreme court case interpreting the meaning of the phrase "intangible personal property" in § 70.112(1).

[35] Although real property was at issue, in *N/S Associates,* 164 Wis. 2d at 54, the court of appeals discussed the inextricably intertwined rule as applying to "property" generally. This court cited *N/S Associates* favorably regarding the inextricably intertwined rule in *ABKA Limited Partnership,* 231 Wis. 2d at 336.

Both personal and real property are assessed on the basis of fair market value and the same methods of valuation, that is, sales, cost, and income, are used for both types of property.

Another reason to apply the inextricably intertwined rule to billboards is that a billboard, though classified in Wisconsin as personal property, appears to be like real property. Jill S. Gelineau argues that in eminent domain cases, billboards should be valued as real property, not personal property.

sis' . . . 'is whether the value is appended to the property, and is thus transferable with the property, or whether it is, in effect, independent of the property so that the value either stays with the seller or dissipates upon sale.' "[36]

¶ 121. It is clear from the case law, from the record in the instant case, and from a commonsense perspective that the cash value (the fair market value) of a billboard is based on income, which is inextricably intertwined with the billboard permit. In *Vivid, Inc. v. Fiedler,* 219 Wis. 2d 764, 781, 580 N.W.2d 644 (1998) (an eminent domain case in which no one argued that the cost approach alone was adequate to evaluate the fair market value of the billboard), this court explained that

> the value of the sign is derived largely from the location of the sign. Therefore, "all right, title and interest in and to the sign and . . . leasehold relating thereto" must include not only the value of the sign structure and leasehold value, but also the value of the location.

It is therefore not the permit but the valuation of the location encompassed in the permit that is included in the assessment of a billboard.

¶ 122. The record in the instant case supports the conclusion that the value of the physical structure of

Gelineau, *supra* note 27, at 30–31 (observing that the value of a billboard is tied to location, permit, and physical structure and that billboards are arguably real property, not personal property, in eminent domain).

[36] *ABKA Ltd. P'ship,* 231 Wis. 2d at 337 (quoting *N/S Assocs.,* 164 Wis. 2d at 54); *see also id.* at 336 ("Whether an income interest may be captured in a property assessment hinges on whether the value appertains to the property. A value that appertains to property is one that is transferable with the property.").

the billboard is inextricably intertwined with the location of the billboard, which is governed by the permit.

¶ 123. First, as the City's supplemental report stated, the materials that make up the billboard do not influence its value. Rather, the value is tied to (that is, inextricably intertwined with) the location of the billboard and, thus, the permit.

¶ 124. Second, on cross-examination, Adams's expert witness agreed that the sign permit is inextricably intertwined with the purpose of the sign and that the permit is the vehicle by which income is derived:

Q So the permit is inextricably, if you will, entwined with the existence and intended purpose of the sign, wouldn't you say?

A Yes.

 . . . .

Q You can buy and sell sign permits, right?

A Yes.

Q If you were to be the negotiator, the appraiser, the whatever you want to call it who is analyzing the sale price of that permit, what would you—you would not look at the dollar value of the physical piece of paper, would you?

A Oh, no, I would look at the marketable value of the permit.

¶ 125. Third, Adams's general manager testified that the value of a billboard and the value of a permit are inextricably intertwined:

Q If you pay $1,500 for a permit to have a sign in Madison, does that get you, your company, more than $1,500 worth of value?

501

Q Okay. Explain why.

A Because having a permit is like gold, and when we have one we can at that point put up a bulletin and make a lot more than $1,500.

Q That's the critical piece of the value of a sign?

A Yeah. I wouldn't be in business if I didn't have any permits.

Q Is the most critical component of a billboard the value of the permit?

A Yes.

Q And without a permit is there value to a billboard?

A No.

Q With a permit is there value?

A Yes.

In other words, structures and permits are bought and sold on the basis of what income is expected to be generated by the billboard with the permit.

¶ 126. Adams's general manager further testified that the income-producing capacity of billboards is tied to the permit, not the physical sign structure, and the permit is transferable to a subsequent purchaser.

Q Now, in the billboard industry is there a market for just used sign structures?

A Not much of one.

Q Is there a market for billboard leaseholds?

A Absolutely.

502

Q Do people buy or do companies buy and sell bill-
boards leaseholds that don't have billboards on
them?

A Yes.

. . . .

Q Are you in the business, meaning Adams of course,
do you have a warehouse full of sign parts that you
sell to others as sign parts on a regular basis?

. . . .

A No, sir.

¶ 127. Finally, a commonsense perspective sup-
ports the conclusion that the value of a billboard is
inextricably intertwined with the billboard permit.
Without a permit, a billboard is nothing more than a
pile of metal and wood. It seems implausible that
personal property that brings in tens or hundreds of
thousands of dollars a year in income has a fair market
value limited to the cost of the pile of metal and wood.
If Adams were to sell its billboards, it surely would get
more than the cost of the materials. How, then, can the
market value of the billboard be just the cost of the
materials?[37] I conclude that it cannot.

¶ 128. I further conclude, as did the circuit court,
that the City did not err in its assessment of Adams's
billboards using the income approach and that the City's

---

[37] *See* Gelineau, *supra* note 27, at 30–31 (noting problems
with the cost approach, including the fact that buyers and
sellers of billboards do not consider replacement cost to reflect
the value of the billboard).

Gelineau observes that "the market value of a sign in place
may be 10 or 15 times the construction cost" and that "the value
of a billboard lies in its location, permit, and physical structure
—not the operating business." Gelineau, *supra* note 27, at 30, 31.

503

application of the income approach properly subtracted value unrelated to the billboards themselves.

¶ 129. After following the twists and turns of the majority opinion, I conclude that on remand the City can use the income method it has used and reach the same result it reached previously.

### III

¶ 130. I now consider Adams's state constitutional challenge to the assessment.

¶ 131. Adams contends that the City's use of the income approach to assess its billboards, but not other commercial properties, violates the Uniformity Clause of the Wisconsin Constitution. Adams's contention is without merit.

¶ 132. The Uniformity Clause, Wis. Const. art. VIII, § 1, provides that "[t]he rule of taxation shall be uniform . . . ."[38] The uniformity clause requires that all

_____

[38] *Gottlieb v. City of Milwaukee,* 33 Wis. 2d 408, 424, 147 N.W.2d 633 (1967), distills the guiding principles of the Uniformity Clause as follows:

1. For direct taxation of property, under the uniformity rule there can be but one constitutional class.

2. All within that class must be taxed on a basis of equality so far as practicable and all property taxed must bear its burden equally on an ad valorem basis.

3. All property not included in that class must be absolutely exempt from property taxation.

4. Privilege taxes are not direct taxes on property and are not subject to the uniformity rule.

5. While there can be no classification of property for different rules or rates of property taxation, the legislature can classify as between property that is to be taxed and that which is to be wholly exempt, and the test of such classification is reasonableness.

property be taxed according to the market value of the property.[39]

¶ 133. There is no requirement, however, that a uniform method or approach to determining market value be used for all property. The Uniformity Clause does not require that each and every property be valued in the same manner. Rather, it requires that, whatever the valuation of the property, the fraction of the value to be paid in taxes must be the same:

> The methods of determining true, current value necessarily differ in the absence of significant sales, but when once the true value is arrived at, each dollar's worth of one sort of property is liable for exactly the same tax as a dollar's worth of any other sort of property, and to assess real property at a different fraction of the value than personalty is error.[40]

¶ 134. This court has explained that "there can be variations in the mechanics of property assessment or tax imposition so long as the resulting taxation shall be borne with as nearly as practicable equality on an ad valorem basis with other taxable property."[41]

¶ 135. There is no allegation that the City assessed different properties at different rates. Using the income approach alone for certain properties and not for others does not violate the Uniformity Clause. This

---

6. *There can be variations in the mechanics of property assessment or tax imposition so long as the resulting taxation shall be borne with as nearly as practicable equality on an ad valorem basis with other taxable property.*

(Emphasis added.)

[39] *State ex rel. Baker Mfg. Co. v. City of Evansville,* 261 Wis. 599, 609, 53 N.W.2d 795 (1952).

[40] *Id.*

[41] *Gottlieb,* 33 Wis. 2d at 424.

505

case is about nothing more than the proper way in which to determine fair market value. The uniformity clause is not implicated.

¶ 136. For the reasons set forth, I would affirm the judgment of the circuit court upholding the City's assessment of Adams's billboards. I therefore dissent.

¶ 137. I am authorized to state that Justice ANN WALSH BRADLEY joins this opinion.